THE PRESIDENT, MANAGERS AND COMPANY OF THE WASHINGTON
AND BALTIMORE TURNPIKE ROAD, *vs.* THE STATE OF MARY-
LAND.

Although provision may be made in its charter for the punishment of a turn-
pike company and its agents, if it shall neglect to keep said road in good
and perfect repair, such provision cannot be held to deprive the State of
its sovereign power to annul a grant, when its purposes have failed,
through the positive or negative act of the party to whom the grant was
made, and when, by a proper legal proceeding, the Court having jurisdic-
tion shall have determined, upon evidence, the issue for the State.

It is a rule of almost universal application, that if a statute fixing a penalty
for an offence, does not either expressly or by necessary implication, cut
off the common law prosecution or punishment for the same offence, it
shall be taken to intend merely a cumulative remedy.

A corporation, by the very terms and nature of its political existence, is sub-
ject to dissolution by a surrender of its corporate franchises, and by a
forfeiture of them for wilful mis-user and non-user.

A general demurrer to a plea confesses all facts stated in the plea, provided
such facts be well pleaded.

Upon a general demurrer, the Court will render judgment against the party
which commits the first error in pleading.

Under the Act of 1860, ch. 326, directing the State's Attorneys of certain

The Pres., Man. & Co. of the Wash. & Balto. Turnpike Road, *vs.* The State.

counties to institute proceedings in the name of the State, to ascertain whether the charter and corporate powers and franchises of an incorporated turnpike company "ought, by reason of *non-user* or *abuser*, to be declared to be vacated and annulled," no form of proceeding being prescribed by the said Act—HELD: that *scire facias* is the appropriate remedy whereby to attain the object of the Act.

The Act of 1832, ch. 306, though prescribing the mode of proceeding by *scire facias*, created no new remedy, but was merely declaratory of the law as it then was, and its repeal by the Code took no jurisdiction from the Courts of Common Law, but left that jurisdiction undisturbed.

Where a *scire facias* setting forth the obligation of a defendant under an Act of incorporation, expressly charges a violation of that obligation, and the mode and manner in which it was violated, and, in the language of the Act, seeks "to ascertain whether the charter and corporate powers and franchises of the defendant ought not, by reason of *non-user and abuser* of said powers and franchises, to be declared vacated and annulled—HELD: that such *scire facias* sets out a substantial cause of action, and with such certainty that the defendant is fully informed of the grounds on which the plaintiff seeks to recover.

Where the 1st and 2nd pleas to the foregoing *scire facias* presented, in substance, the following defence: that because the State, in the exercise of its sovereign powers, had authorized the building of a railroad between the same *termini* as those of a turnpike company previously incorporated by her, and because the building of said railroad was followed by a serious loss of revenue by the turnpike company, therefore the said turnpike company is relieved from the obligations imposed upon it by its charter, and the State disabled from instituting and prosecuting proceedings to vacate and annul its charter, unless in violation of the Constitutions of the State of Maryland and the United States—HELD: that such pleas do not offer a legal defence to the allegations of the *scire facias*, if those allegations are sustained by competent evidence, sufficient to justify the jury in finding for the plaintiff, on the issue of *not guilty*.

It may be true, as alleged in the 3rd plea to said *scire facias*, that the Act of 1838, ch. 54, recognized the corporate existence of the turnpike company, and admitted that its road was then maintained and kept in sufficiently good order and repair, and that during the whole of the year next preceding the issuing of said *scire facias*, it was kept in as good order and repair as when said Act was passed; or, as is alleged in the 4th plea, that the State, by its Acts of Assembly and the conduct of its officers, admitted that until 1858, the said road was kept in sufficiently good order and repair, and that while in that condition, the company was enabled to effect, by agreement, a sale of stock, from the proceeds of which sale the said road was put in better order during the year next preceding the issuing

The Pres., Man. & Co. of the Wash. & Balto. Turnpike Road, *vs.* The State.

of said *scire facias*, than it was at the date of said agreement and sale'; yet it cannot be successfully contended that the State, by its action set forth in said pleas, deprived itself of the right to institute the proceeding in this case.

Notwithstanding the Act of 1833, recited in the 5th plea, and the privilege to charge tolls on steam-carriages, and the resolution passed by the turnpike company, to contract for the loan of money upon the security of the tolls, and though the said company may have applied all the tolls (as stated in the 7th plea) to the repair of the road, the State is not barred by the matters so pleaded, of its right to institute the proceedings in this case.

A plea of limitations not filed within the time prescribed by the rules of Court, was properly stricken out by the Court below, and in the absence of the rule from the record, it must be presumed that the Court acted in conformity with its own rule.

The proceeding under the *scire facias*, in all its stages in this case, is essentially a civil action, and within the cognizance of the Superior Court of Baltimore city.

A witness, examined upon his *voire dire*, stated that he constantly used said turnpike road, sometimes commuting his toll by the year, and sometimes paying by the trip; and that if said road be condemned in the present proceeding, he will travel over it free of toll, because, in his opinion, it will then be a county road. HELD: That the interest disclosed by the answer of the witness, is not such as to disqualify him; and that if it appears to the Court that a witness is not, though he thinks himself interested, he shall be sworn in chief.

The plaintiff offered in evidence to the jury the want of repair of the defendant's road, in parts thereof lying outside of the limits of the city of Baltimore, the defendant objecting to the offer—HELD: That the objection was not tenable, because the road was an unit, and the evidence should be co-extensive therewith. '

Where the evidence offered by the plaintiff and objected to by the defendants, was a want of repair of the defendants' road, "existing more than one year before the commencement of this prosecution," the Court held as follows: Conceding that a defence under Art. 57, sec. 10, of the Code, may be availed of under the general issue, without being specially pleaded, (though not so deciding,) the provision of the Code referred to does not apply to the proceeding in this case.

Although the result of a decision on the *scire facias*, against the defendant, will involve a forfeiture of its franchise, it cannot be said that this is a prosecution for a fine or forfeiture, within the meaning of the sec. and Art. of the Code referred to.

Questions propounded to a witness, on cross-examination, as to what were

the calculations upon which were based certain expectations of profit from a contemplated purchase of the road by a new company, in the event of its condemnation, are wholly irrelevant to the issue in the case, and inadmissible.

The plaintiff having offered evidence tending to show the wilful neglect of the defendant to keep its road in repair, the defendant sought to rebut this evidence by proof of its inability to keep said road in repair, in consequence of certain legislation by the State—HELD: That such rebutting evidence was inadmissible.

A prayer submitting to the jury to find whether the defendant had failed and neglected to maintain and keep its road, or parts thereof, and the bridges over the streams crossing the road, in good order and repair, and whether the same were maintained in the manner prescribed by the Act of 1812, ch. 326, and presenting to the jury the subject of inquiry, in conformity with the requirements of the Act, was properly granted.

APPEAL from the Superior Court of Baltimore city.

This is a *scire facias*, issued by order of the appellee against the appellant, in pursuance of the Act of Assembly of 1860, ch. 326, entitled, "An Act to authorize and direct the State's Attorneys for Baltimore city, Baltimore county, Anne Arundel county, and Prince George's county, to institute proceedings to forfeit the charter" of the appellants. The writ recites the incorporation of the appellants in 1812, and the making of the road in pursuance thereof. It recites, also, the duty imposed upon the company by the 13th section of their charter, with reference to the maintaining and keeping their road in good order and repair. It then avers that the defendants had "wilfully and for a long time neglected to keep their said road, or parts thereof, and the bridges over the streams crossing said road, in such good order and repair as are required by said Act, and by the thirteenth section especially, in violation of their chartered obligations, and in disregard of the rights of the State, and to the great injury, inconvenience and detriment of the public travelling upon said road." After referring to the Act of 1860, ch. 326, already mentioned, it concludes in the usual way, by calling on the defendants (appellants) to

show cause "why their charter and corporate powers and franchises ought not to be declared to be vacated and annulled."

The appellants filed nine pleas, the first seven of confession and avoidance, the eighth that of limitations, and the ninth the general issue.

The 1st plea states, that after the said turnpike road was perfected, examined, approved and licensed, in the manner prescribed by the 15th section of the Act of Assembly by which it was incorporated, certain other Acts of Assembly were passed, in pursuance of which the Washington Branch of the Balto. & Ohio R. R. was constructed, in a great measure with the money of the State, the State also receiving therefrom a considerable income; that the said turnpike had been kept in as good order and repair as when it was examined, &c., until by the diversion of its trade and travel to the said railroad, its income was so reduced as to deprive the said President, Managers and Company of the means of maintaining said turnpike road in better order than it now *is*; and concludes, "so the defendants say that they have not, as in the said *scire facias* is suggested, wilfully and for a long time neglected," &c.

The 2nd plea alleges, that during the legislation for the construction of the said railroad, the President, &c., of the turnpike company opposed and protested against its action, and predicted the injurious effects of such action upon the interests of the turnpike company; that the Legislature, professing to recognize the importance of preserving the said turnpike road in its then state of usefulness, authorized the said President, &c., of the turnpike road to subscribe for a certain amount of the stock of said railroad, the dividends received in virtue of which subscription, were to be applied to the repairs of said turnpike road; that the means of the said President, &c., had already been exhausted in the construction of said turnpike road, in con-

sequence of which they were unable to avail themselves of such right of subscription, until by another Act of Assembly said right was determined; whereby they were deprived of the means of maintaining the said turnpike road in better order than it now is; "so that the defendants say," &c., as in the 1st plea.

The 3rd plea recites the Act of the 10th of February 1839, relating to the hearing of an appeal in a suit then pending in Baltimore County Court, between the said turnpike company and said railroad company, by which it was admitted that the said turnpike road was then maintained "in sufficiently good order and repair;" and alleges "that during the whole of the year next preceding the commencement of this suit, the said turnpike road has been kept in as good order and repair as it was at the time of the passage of the said Act of the 10th of February 1839."

The 4th plea alleges, that "the State, by its Acts of Assembly, and the conduct of its officers, has admitted that until 1858, the said turnpike road was kept in sufficiently good order and repair," and that its stockholders were induced to sell, and other parties to purchase, in October 1858, fifteen hundred and forty shares of its stock, upon the faith of the admission by the State, that while the said turnpike road was maintained and kept in as good order and repair as at the time of the said sale, "the State would consider that no sufficient cause existed for annulling its chartered and corporate powers and franchises;" and further alleges, that soon after said transfer of stock, the said turnpike road was put in better order and repair, and during the whole of the year next preceding the commencement of this suit, has been in better order and repair than it was at the time of said sale and transfer.

The 5th plea recites the passage of a supplement to the Act of Assembly first mentioned in the *scire facias*, authorizing the said turnpike company to charge tolls on steam-

carriages travelling on their road, and alleges that with reference to said supplemental Act of Assembly, the said turnpike company authorized its president to convert the turnpike road into a plank road, to build and rebuild bridges, and to make general repairs thereon; that to effect these several purposes, the sum of two thousand dollars was borrowed on the faith of the tolls and duties authorized to be charged, the surplus of which, after deducting so much as might be necessary to keep the road in repair, was pledged to secure the repayment of the amount so borrowed; but that since then, the tolls and duties had not been more than sufficient to keep the road in repair; that the whole amount so borrowed is still due, with interest; that the defendants have no other means than said tolls and duties wherefrom to pay the same, and that if "such security as is afforded by said tolls and duties shall be taken away against the consent of the persons from whom said money was borrowed, it will, in effect, be taking their property for public use, without just compensation, contrary to the Constitution of the State of Maryland, and contrary to the Constitution of the United States."

The 6th plea alleges, that in pursuance of the authority given them by their charter, and in consideration of the sum of $2,000 borrowed, as stated in the 5th plea, the said turnpike company had granted to the parties from whom they had borrowed the said sum of money, for the period of seven years, the tolls and duties which they were authorized to charge, the said parties covenanting to apply the said tolls and duties first to the management and repairs of said turnpike, and the surplus, if any, to their use, "so that the said President, Managers and Company say that they are not now possessed of the said franchise, and that any condemnation of said franchise must be subject to the rights and property of the said grantees therein."

The 7th plea alleges, that although the charter of the

company provides "that there shall be tolls yielding to the stockholders, in net profits, not less than ten per cent. per annum, yet no such profits, nor any profits whatever, have been divided among the stockholders during the time which has elapsed since the agreement to purchase, mentioned in the fourth plea, but during the whole of that time all of the tolls and duties received for passage upon and along said road, have been applied to maintain and keep said road in good order and repair.

The 8th is the plea of *limitations;* and the 9th *"not guilty."*

The State demurred to the first seven pleas, entered a motion to strike out the eighth plea, on the ground that it had not been filed within the time required by the rules of the Court, and joined issue on the ninth. The demurrer and motion was sustained by the Court. The defendants then filed an additional plea to the jurisdiction of the Court, stated in the opinion of this Court, to which the State demurred, and this demurrer was also sustained.

At the trial of the cause, six exceptions were taken by the appellants, to the several rulings of the Court below, (MARTIN, J.,) the questions presented by which, are stated in the opinion of this Court.

*1st Exception.* At the trial of the cause, the plaintiff, to maintain the issue on its part joined, called as a witness Michael Waterman, who being sworn on his *voire dire,* said, that he resided in the thirteenth election district of Baltimore county, that his road to Baltimore is by the Sulphur Spring road, to where it joins the Washington road, and thence by the Washington road to the city; that he could also go by the Frederick turnpike road, which is about as far distant from his house as the Washington road is, but the distance by that road to the city is two and a half miles further than by the Washington road; that he has

been in the habit of commuting his toll on the Washington road at twenty-five dollars per year, but that this year he pays by the trip, which costs him ten cents for coming and going; that if the Washington road be condemned in the present proceeding, he will travel over it free of toll, because, in his opinion, it will then be a county road. Whereupon the defendant moved the Court to exclude the said witness, as incompetent to testify for the plaintiff, which motion the Court refused, and permitted the said witness to be sworn in chief, and the defendant excepted.

The second and third exceptions are stated in full in the opinion of this Court.

*4th Exception.* After offering the evidence stated in the foregoing bills of exception, which were made part of this, the plaintiff further offered in evidence, by several competent witnesses, the want of repair of the defendant's road, among which witnesses was Charles Rittenhouse, who, being cross-examined by the defendant, stated that he had in his own mind, and may have stated it to several, a plan for the taking of this road, in case of its condemnation, into the ownership of a new company, to be by the said new company repaired and made subject to toll, which he thought would be profitable. He also stated that he had fixed upon the expenditure of eleven hundred dollars per mile, as the sum necessary to put said road in such productive condition. Whereupon the counsel for the defendant proposed to ask the witness by what calculation as to the expenditure of the said capital, and the necessary expenditure for repairs and interest on said capital, he proposed to make said company a profitable investment; but the plaintiff, by its counsel, objected to said question, which objection the Court sustained, and would not allow the said question to be put to the witness, and the defendant excepted.

*5th Exception.* The evidence in the foregoing four bills

of exceptions having been offered and given as therein stated, which said bills of exception are made part of this, the plaintiff further offered evidence tending to show the wilful neglect of the defendant to keep its road in repair, and here closed its case. The defendant then, in order to rebut the allegation of the declaration, "that the said defendant had wilfully and for a long time neglected and failed to keep its road in repair," as also the evidence which the plaintiff had offered, to sustain said allegation, offered to prove "that it had expended its whole capital of one hundred thousand dollars, and forty thousand dollars derived in part from the tolls of a portion of the road then opened, and in part from additional subscriptions by its stockholders, in the building of said road, and that it had no other property but its franchise to take tolls from persons using its said road, and that the said defendant expends the entire receipts of the road in its repair, and that the want of repair, if the jury shall find such to exist, is not the result of the wilful act of the said defendant, but arises solely from its want of pecuniary ability. And the said defendant, in order to show the cause of such pecuniary inability, proposes to show, by evidence to the jury, the amount of receipts and expenditures of the said road prior to the opening and use of the Washington Branch railroad, and the falling off of the said receipts thereafter, and the causes thereof, and read to the jury the Acts of Assembly of Maryland, of 1827, ch. 170, sec. 15; 1828, ch. 139, sec. 20; and 1830, ch. 158, sec. 4, to show the action of the State with reference to the defendant." To the admissibility of this evidence the plaintiff objected, and the Court having sustained said objection, and refused to let the said evidence go to the jury, the defendant excepted.

*6th Exception.* The evidence in the foregoing five bills of exception having been offered and given, as therein stated, which said bills of exception were made part of this, the

plaintiff prayed the Court to instruct the jury as follows: "If the jury believe, from the whole evidence in the case, that the defendant had, at the time of the passing of the Act of 1860, ch. 326, given in evidence, failed and neglected to maintain and keep their road, or parts thereof, and the bridges over all the waters crossing said road, in good order and repair, by erecting and maintaining permanent bridges over all the waters crossing said road, wherever the same were found necessary, by maintaining said road sixty feet wide, and eighteen feet at least thereof an artificial road, solid, durable and even to the surface, by bedding the same with wood, stone, sand or gravel, a sufficient depth to secure a good foundation to the same, and by maintaining the said road faced with gravel or stone pounded, or other small, hard substance, in such manner as to secure a firm and (near as the materials would reasonably admit) an even surface, then their verdict should be for the plaintiff." To the giving of which instruction the defendant objected, but the Court overruled said objection and granted the instruction, and the defendant excepted.

The verdict of the jury being for the plaintiff, the defendant moved in arrest of judgment, but the Court overruled said motion, and entered judgment for the plaintiff. The defendant appealed, 1st, from the rulings of the Court below, sustaining the demurrers of the State to the first seven pleas, and to the additional plea to the jurisdiction, and granting the motion to strike out the eighth plea; 2nd, from the various rulings set out in the six exceptions; and 3rd, to the overruling of the motion in arrest of judgment.

The cause was argued before BOWIE, C. J., and BARTOL and GOLDSBOROUGH, J.

32      v.19

*G. W. Dobbin*, for the appellants:

We insist that the charter and corporate powers and franchises of the appellants ought not to be declared to be vacated and annulled, but that on the demurrers to the pleas, final judgment should be given for the defendants. For on those demurrers the Court is to go back to the first fault. *People of Vermont vs. Society for Propagating the Gospel, Paine's C. C. R.*, 660. *Atty. Gen. vs. Petersburg & Roanoke R. R. Co.*, 6 *Iredell*, 465. And here it was a fault to resort to the *scire facias* at all. For "there is no power reserved to destroy the franchise." *Kellogg vs. Union Co.*, 12 *Conn.*, 19. And according to section 26 of the charter, the proceeding should have been by information to a justice of the peace. Under that section, not even an indictment would lie. 2 *Hale's P. C.*, 171. *Rex vs. Buck*, 1 *Stir.*, 679. *Rex vs. Wright*, 1 *Burr.*, 545. *Brown vs. Com.*, 3 *S. & R.*, 274. *Com. vs. Evans*, 13 *Id.*, 426. If it be said, that under section 23, there might be an indictment, still the remedy must stop there. For "it is a rule, that upon a new statute which prescribes a particular remedy, no remedy can be taken but the particular remedy prescribed by the statute." *Stevens vs. Evans, &c.*, 2 *Burr.*, 1157. *Underhill, &c., vs. Ellicombe, McClel. & Y.*, 450. It will not do to say that this is matter of contract. The Supreme Court of the United States, after observing that "such penal provisions are to be found in many charters," tells us that the Court "are not aware of any case in which they have been held to be mere matters of contract." *State of Maryland vs. Balto. & Ohio R. R. Co.*, 3 *How.*, 552. But suppose it be conceded that the Act creates an obligation, what then? It may be true, as *Ld. Tenterden* says, that "if an obligation is created, but no mode of enforcing its performance is ordained, the common law may, in general, find a mode suited to the particular nature of the case." But "where an Act creates an obligation, and en-

forces the performance in a specified manner," he considers, and the King's Bench "take it to be a general rule, that performance cannot be enforced in any other manner." *Doe vs. Bridges*, 1 *Barn. & Adol.*, 859, 20 *Eng. C. L. Dundalk R. Co. vs. Tapster*, 1 *Adol. & El., N. S.*, 667, 41 *Eng. C. L. Stevens vs. Jeacocke*, 11 *Adol. & El., N. S.*, 741, 63 *Eng. C. L. Marshall, &c., vs. Nicholls*, 18 *Adol. & El., N. S.*, 882, 83 *Eng. C. L.*

Nor is this view answered by the judgment in the latter part of the reign of Charles II, upon the information in the nature of a *quo warranto* in *The King vs. Mayor, &c., of London*, 2 *Show.*, 279. For this judgment found support in statutes which do not exist in Maryland; of which one was the statute concerning liberties and franchises, and the *quo warranto*, entitled *statutum de quo warranto*, passed 6 Edw., 1. (1278,) of which *Ld. Coke* treats in 2 *Inst.*, 279, 280; and another was the Stat. 28 Edw., 3, ch. 10, enacting that "on the first offence the city of London shall forfeit 100 marks; on the second, 2,000; and for the third, the liberty and franchise of the city of London shall be taken into the King's hands." 2 *Show.*, 278. To this the Court expressly refers as authority for its judgment.

And notwithstanding this source of authority for the judgment, it was greatly disapproved. See 6 *Hume's Eng. Ch.*, 69, *p.* 258. 2 *Hallam's Const. Hist.*, 611, 612. 3 *Steph. Com.*, 143. 9 *Gill*, 404. It was in vain that Charles II granted new charters. The proceedings as to London, Chester, and other corporations, were declared void, by a proclamation of James II, nine days before the landing of King William. *Newling vs. Francis*, 3 *T. R.*, 196; then, by a statute of 2 W. & M., sess. 1, ch. 8; and also by the House of Lords, sitting as an appellate tribunal, *Skinn.*, 310. See, also, *Eyres, J.,* in *S. C., (King vs. Mayor, &c., of L.,)* 1 *Show.*, 278; and *Sir James Smith's case*, 4 *Mod.*, 52; *Pepper vs. Mayor, &c., of Drogheda*, 2 *Brown, Par.*

The Pres., Man. & Co. of the Wash. & Balto. Turnpike Road, *vs.* The State.

*Cas.*, 321, of *Tomlin's ed.;* and *The King vs. Amery, Id.*, 336. Yet the judgment of the King's Bench in *The King vs. Amery*, 1 *T. R.*, 575, 2 *Id.*, 515, "has exerted much influence upon the text writers; and they have sometimes misled American judges." For notice has not always been taken of the fact, adverted to by the Supreme Court of the U. S., in *Bacon, &c., vs. Robertson, &c.*, 18 *How.*, 484, that the judgment of the King's Bench was reversed in the House of Lords; that House (in accordance with the unanimous opinion of the judges who advised them) holding that the prior charter remained in force, and that the new charter, granted by Charles II, was void, *ab initio.* 2 *Brown's Par. Cas.*, 336, of *Tomlin's ed.*

Further legislative provision was made by the Stat. of 9 Ann., ch. 20, (2 *Selw.*, 1190,) discussed in *The King vs. Taylor*, 2 *Barnard*, 238, 280, 316, 320, and *Rex vs. Ponsonby, Sayer*, 245, 2 *Brown's Par. Cas.*, 319, of *Tomlin's ed*. But that statute has not been enacted in Maryland; and it moreover relates to an information in the nature of a *quo warranto*, and not to a proceeding by *scire facias*, as this is.

We submit that no authority to sustain this proceeding is furnished by the judgments in an arbitrary reign—judgments afterwards declared illegal by the legislative and judicial tribunals; judgments founded on English statutes, which have not been enacted in Maryland, and rendered not on a *scire facias* like this, but on an information in the nature of a *quo warranto.* 3 *Steph. Com.*, 148.

Nor is authority for this proceeding to be found in cases in this country, founded upon State enactments, which are of no force in Maryland, and in which, moreover, the proceeding was not by *scire facias*, but by information. Such are the cases of the *Atty. Gen. vs. Petersburg & Roanoke R. R. Co.*, 6 *Iredell*, 456, and *The People vs. Bank of Niagara*, 6 *Cow.*, 196; of which the former was an information,

founded on the North Carolina Act of 1831, Rev. Stat., ch. 26; and the latter had to sustain it (beside the stringent provision in the tenth section of the charter copied) the general statute of 1825, sess. 48, ch. 325, sec. 7; from which is taken the provision in 2 *R. S.*, part 3, art. 2, ch. 9, sec. 39, p. 583 of 1st, p. 483 of 2nd ed.

The only statute on the subject, existing in Maryland, is the Act of 1860, ch. 326, passed in view of the rule in England, as to the authority of the Attorney General, (*Ibbotson's case, Cas Temp. Hardw.*, 261; *Rex vs. Carmarthen*, 2 *Burr.*, 870; *The King vs. Ogden, &c.*, 10 *Barn. & Cress.*, 230, 21 *Eng. C. L.*,) and the understanding here, that no such proceeding can be maintained but at the instance of the Government. *Com. vs. Union Fire & Marine Ins. Co.*, 5 *Mass.*, 230. *Wallace vs. Anderson*, 5 *Wheat.*, 291.

This Act does not prescribe the nature of the proceedings to be instituted. It may be that the draftsman of the Act thought the proceedings would be regulated by the general Act of the 18th of March 1833; but that not being retained in the Code of Maryland, can furnish no rule on the subject.

The more the question is examined, the more insuperable will be found to be the difficulties in the way of the other side. When we are told that, although section 26 of the charter gives a specific remedy, and there is no general statute giving any other; yet, nevertheless, the other side claim that a *scire facias* lies, alleging the forfeiture of the defendant's franchise, (3 *Cruise's Dig.*, *tit.* 27, *p.* 250; 5 *Id.*, *tit.* 34, *p.* 39,) we answer that this claim is inconsistent, not merely with the general rule, that the performance can be enforced only in the mode prescribed by the statute creating the obligation, but also with a rule no less general, that a *scire facias* is a writ founded on matter of record.

In England, the King may proceed by *scire facias* to annul letters patent for an office. *Rex vs. Eston,* 2 *Dy.,* 198. For they are enrolled in the Court of Chancery, and therefore matter of record. 4 *Inst.,* 209; also 88. 2 *Bac. Abr., tit. scire facias (C)* 3. 2 *Wms. Saund.,* 72, *a.* But the English Courts keep steadily in view that a *scire facias* is a judicial writ, and ought to be founded on a record. *The King vs. Rooks, Cro. Car.,* 491. *The King vs. Butler,* 3 *Lev.,* 223.

Here there is no such record as existed in those cases, there being no office found, and the *scire facias* not being founded upon any letters patent enrolled of record.

The opinion in *The King vs. Pasmore,* 3 *T. R.,* 244, cited in *Slee vs. Bloom,* 5 *Johns. C. R.,* 380, was delivered before the judgment of the King's Bench, in *The King vs. Amery,* 2 *T. R.,* 515, was reversed by the House of Lords, (2 *Brown's Par. Cas.,* 336,) and may not have been expressed quite so carefully as it would probably have been if delivered after that reversal; but it may well be satisfied by applying it to the case of letters patent granted by the King. There is no occasion to construe it—nor should it be construed—as in disregard of the distinction, well established in England, between the case of one claiming merely under such letters patent, and a corporation created by an Act of the Legislature. *Grant on Corp.,* 42, *note (h;)* also 307. If so construed, it would be nothing more than an *obiter dictum.* Upon no better foundation than this *dictum* rests the *dictum* of Buchanan, C. J., in the *Canal Co. vs. Railroad Co.,* 4 *G. & J.,* 121, unless, indeed, the Act of 1832 was in force at the time of his opinion, as it was at the time of the decisions in the *Regents of University vs. Williams,* 9 *Id.,* 326, and in the *Board of Com. vs. The State,* 9 *Gill,* 403. In the last case, by mutual consent of parties, it was agreed that a *scire facias* be issued to try the alleged forfeiture. In the present case, there is

no such consent, and for the first time the Court of Appeals of Maryland is called on judicially to decide whether, without such consent, and without any such Act as that of 1832, a *scire facias* is the proper remedy.

The position that the Act of 1832 was "declaratory only," and that without it the *quo warranto* was not, and the *scire facias* was, the proper remedy, is opposed to cases before cited, and to *Com. vs. James River Co.*, 2 *Va. Cas.*, 190. The further position, that in Maryland there are "no other corporations except those chartered by the Legislature," may not be entirely accurate, if it be true that there are general statutes under which there are records of corporations.

When, as in this case, a corporation claims to be created by a direct Act of the Legislature, it is the misfortune of the other side that there is in Maryland no general statute under which there may be prosecuted against it such a *scire facias* as lies at common law against one claiming under letters patent. To say that there ought to be such a statute, will not avail them; for, as this Court has said, "it is the province of Courts of Justice to expound laws, and not to legislate; that, is a duty which belongs to a different department of the Government." *Mitchell vs. Mitchell*, 1 *Gill*, 83, 84.

In the absence of any statute of Maryland changing the common law rule, it is for this Court to decide according thereto, and hold that a *scire facias* will not lie against a corporation aggregate to vacate or annul a charter created by statute, there being in the Court from which the *scire facias* issues, no record on which to found it. *Bynner vs. Regina*, 9 *Adol. & El.*, 553, 58 *Eng. C. L.*

Even supposing a *scire facias* would lie, "still legal causes must be stated." "For every *imaginable* breach, the law does not design that the charter of a corporation must be revoked." *Board of Com. vs. The State*, 9 *Gill*,

403. Here there is no breach at all as to the *bridges*, for the 13th section of the charter, giving power to erect bridges, is permissive only, not mandatory. "*Shall have power to,*" means no more than "*may,*" and in the charter this is plainly distinguished from "*shall.*" Moreover, as to the road itself, the plaintiff "must set out the substance of a good cause of forfeiture, in its essential circumstances of time, place and overt acts. That rule belongs to all pleading, and especially is it proper in reference to a proceeding, in its nature criminatory, to insist upon a forfeiture of valuable franchises, which cost a great outlay of capital." Ruffin, C. J., in *Atty. Gen. vs. Petersburg & Roanoke R. R. Co.*, 6 *Iredell*, 465. Here that rule is not complied with. As there was judgment for the defendants on the 7th, 8th and 10th replications in *The People vs. Bristol & Rensselaerville T. P. Co.*, 23 *Wend.*, 231, so there should be judgment for the defendants here.

II. If, looking at the charter and allegations of the plaintiff, a *prima facie* case were shown for a *scire facias*, that remedy appears quite inappropriate, when the allegations in the 5th and 6th pleas are considered in connection with section 31 of the charter. The State must be held to have contracted with the company, in contemplation of such a demise as is authorized by that section, and the State cannot maintain this proceeding when it is not "acting up to the terms of its charter, and complying with its obligations." Effect must be given to the demise to the full extent contemplated by the statute. The subject authorized to be granted, must be held to pass for the full term of seven years, and during the time for which the State has authorized the demise, it cannot, through any tribunal, impair that demise. How, then, on this *scire facias*, can there be a judgment of forfeiture? In England there are many turnpike Acts, giving power to mortgage the tolls. *Doe vs. Booth*, 2 *Bos. & Pul.*, 219. *Doe vs. Lediard*, 4

*Barn. & Adol.*, 137, 1 *New. & Man.*, 683. *Doe vs. Penfold*, 3 *Adol. & El.*, *N. S.*, 757, 43 *Eng. C. L.* Each mortgagee is held entitled, if not paid, to possess himself of the mortgaged premises. But we find in England no instance of a proceeding by *scire facias* or *quo warranto* under such circumstances. Seeing the number of turnpike Acts with mortgage powers, the absence of such proceedings there, is itself suggestive. It is thought there, that what is proper in such a case, is not a forfeiture of the charter, but obedience to its provisions; and the remedy to procure such obedience, is very different from a *scire facias* or *quo warranto*. *Grant on Corp.*, 308. Buller, J., tells us that to enforce obedience to Acts of Parliament, a *mandamus* is the proper remedy. *Bull.*, *N. P.*, 199. It was the remedy in *The King vs. Severn & Wye Railway Co.*, 2 *Barn. & Ald.*, 646, and *The Queen vs. Bristol Dock*, 2 *Adol. & El.*, *N. S.*, 64, 42 *Eng. C. L.* If there it was the proper remedy, *a fortiori*, no other remedy can be proper here, in view of the peculiar provision as to a demise of the tolls. Nor is this argument answered by imputing to us the doctrine "that the existence of a private contract of the corporation should force upon it a perpetuity of existence, contrary to public policy, and the nature and objects of its charter." On the contrary, what we contend for is quite consistent with *Mumma vs. The Potomac Co.*, 8 *Peters*, 286, 287, as understood in *Bacon, &c., vs. Robertson, &c.*, 18 *How.*, 486, 487. We say that the doctrine of the latter case will be carried out in the best and most simple manner by holding, in accordance with the English authorities, that the *scire facias* is not to be maintained upon the case disclosed by these pleas, but the plaintiffs are to be left to resort to the writ of *mandamus*. On a *mandamus*, the Court would consider not one section merely, but all the sections of the charter. Obedience to those sections of the charter on which the State relies, would be

33      v.19

enforced so far as consistent with the rights arising under the section authorizing the demise.

III. The act "to furnish ground of forfeiture," must be *wilful*. It must be something more than accidental negligence. Lewis, C. J., in *Erie & N. E. R. R. Co. vs. Casey*, 1 *Grant*, 285. Woodward, J., considers there must be "something more than involuntary misconduct, or mere technical wrongs—something that implies a high degree of turpitude—a wilful malfeasance—a species of misdemeanor," *S. C.*, 293; and Black, J., in delivering the opinion of the majority of the Court, lays down "that it must be *wilful*, that is, not involuntary." *S. C.*, 2 *Casey*, (26 *Penn.*,) 319. Not only is this a rule of law, but in the *scire facias* it is alleged that the defendants have *wilfully* neglected and failed to keep their road in good order and repair. This allegation is well answered by the plea which states that, although the stockholders have not had what they are entitled to under the 19th, 20th, and 21st sections of the charter, yet "all of the tolls and duties received for passage upon and along said road, have been applied to maintain and keep said road in good order and repair," thereby showing that, if there has been such failure, it has not been the fault of the defendants, but, on their part, wholly involuntary. On *general* demurrer, the objection that the plea is an argumentative denial of not guilty, is of no avail, when the facts alleged in the plea, and admitted by the plaintiffs, show that there has been no breach of duty. *Brass vs. Maitland*, 6 *El. & Bl.*, 486, 88 *Eng. C. L.*

IV. The allegation in the *scire facias* is still more conclusively answered by the 1st and 2nd pleas. It will not do to say that a party contracting to do a thing, must do it at all events. The plaintiffs admitting that the condition precedent has been performed, and claiming to divest an estate or franchise for breach of a condition subsequent,

DECEMBER TERM, 1862. 259

The Pres., Man. & Co. of the Wash. & Balto. Turnpike Road, vs. The State.

(*People vs. Manhattan Co.*, 9 *Wend.*, 379; *Thompson vs. The People*, 23 *Id.*, 588,) the breach of such condition is excused when performance is prevented by the act of God or of the law, or of the party complaining of the breach. *Br. Abr.*, tit. *Conditions*, *pl.* 127, 150. *Vin. Abr.*, tit. *Condition*, (*G. c.*) *pl.* 18, 19, and (*I. c.*) *pl.* 16. *Bac. Abr.*, tit. *Condition*, (*Q.*) This is illustrated as to the act of God in *Co. Lit.*, 206, *b; Kingswood vs. Chapman*, 2 *Leon.*, 155; *Wood vs. Bates, Sir Wm. Jones*, 171; *Williams vs. Lloyd, Id.*, 179; *Bridges vs. Bedingfield*, 2 *Mod.*, 28; *The People vs. Manning*, &c., 8 *Cow.*, 297; *Carpenter vs. Stevens*, &c., 12 *Wend.*, 589; *The Queen vs. Justices of Leicestershire*, 15 *Adol. & El., N. S.*, 88, 69 *Eng. C. L.; Hall vs. Wright, El., Bl. & El.*, 746, 96 *Eng. C. L.* As to the act of law, in *Brewster vs. Kitchell*, 1 *Salk.*, 198; *The People vs. Bartlett*, 3 *Hill*, 570. And as to the act of the party complaining, in 1 *Rolle's Abr.*, 453, 454, tit. *Condition*, (*N.;*) *Id.*, 455, tit. *Condition*, (*P.;*) 5 *Vin. Abr., Condition*, (*M. c.*,) 242; *Id.*, (*N. c.*,) 243, 244; *Co. Lit.*, 206, *b; Shep. Touch.*, 174; *Com. Dig., Condition*, (*L.*) 6; 2 *Man. & Gr.*, 744, note (*b;*) *Cort vs. Ambergate*, &c., *Railway Co.*, 17 *Adol. & El., N. S.*, 146, 79 *Eng. C. L.*

On the ground that the effect of a particular Act of Parliament was to render impossible the performance of the obligation by the corporation, judgment was given for the defendants in *Brown vs. Mayor*, &c., *of London*, 9 *Com. B.*, (*J. Scott,*) *N. S.*, 726, 99 *Eng. C. L.* And because of the conduct of the plaintiffs, it did not lie in their mouth to say that there was a breach of contract in *Pole vs. Cetcovitch*, 9 *Com. B.*, (*J. Scott,*) *N. S.*, 438, 99 *Eng. C. L.;* Erle, C. J., confessing "a feeling that the defendant was thoroughly entitled to a decision in his favor before any tribunal."

As Lord Coke tells us, the common law is "always grounded upon right and equity." 10 *Rep.*, 108. It is

"built on the perfection of reason." 3 *Rep.*, 13, *b*. *Nihil quod est contra rationem est licitum*. *Co, Lit.*, 97, *b*. And thus, while Courts of Equity act on the rule that he who asks for equity must do equity, Courts of Law act on the analogous principle that "if the obligee himself be the cause of the non-performance, he shall have no advantage of any forfeiture." Croke, J., in *Quick vs. Harris*, 3 *Bulstr.*, 31.

In the present case, to act on this principle and hold the pleas good, is nowise inconsistent with the *Charles River Bridge vs. Warren River Bridge*, 11 *Peters*, 420, or the *Washington & Baltimore Turnpike Road vs. Baltimore & Ohio R. R. Co.*, 10 *G. & J,*, 392.

One who is absolute owner of a tract of land on which there is a mill and a stream of water to its wheels, though he had taken from another a covenant to work the mill, might, in the exercise of his "sovereign rights and powers," construct another mill and put it in operation, and divert to the second mill the water which had before run to the first. But he could not, in any Court of Justice, sustain a claim founded on a breach which he himself had, by such diversion, caused; for the covenantor will be "discharged from the obligation, if the party for whose benefit it was made, performs any act by which the covenantor is incapacitated to observe his contract." *Platt on Cov.*, *part* 6, *ch.* 2, *p.* 595. Among other illustrations of the principle are the following, in 5 *Vin. Abr.*, tit, *Condition*, (*N, c.*,) 244:

6. "If lessee for years covenants to drain the water that stands upon the land before such a day, and after the lessor enters upon the land and disturbs the lessee, this is a good excuse of the performance of the condition."

7. "If a man covenants with me to collect my rents in such a town, if I interrupt him in the collecting thereof, this excuses the covenant."

8. "If lessee for years of an house covenants to repair it, and to leave it in as good plight as he found it, and after certain sparks of fire come out of the chimney of the lessor, in an house not much remote, by which the house of the lessee is burnt, this will excuse the performance of the covenant to the lessee, so that he is not bound to rebuild, because this comes by the act of the lessor himself."

And there are many other cases illustrating what (*p.* 246, *pl.* 25) is laid down as a "general rule in conditions, that if the plaintiff himself be the cause of disablement, so as the condition cannot be performed, he shall not take advantage of the condition."

*Pl.* 31, it is said, "If A. be bound to B. that J. S. shall marry Jane G. before such a day, and before the day B. marries with Jane, he shall never take advantage of the bond; for that he himself is the mean that the condition could not be performed; and this is regularly true in all cases."

Is it to be maintained that the State of Maryland is above the law—that she is not bound by the ordinary principles of justice? This surely cannot be. It must be no less true of the judiciary of Maryland than of the judiciary of Pennsylvania, that "the rules of law which govern it in the administration of justice, form a part of every contract, whether with the State or with individuals." *Erie & N. E. R. R. Co. vs. Casey*, 1 *Grant*, 283.

In the *scire facias* of *The King vs. Rooks, Cro. Car.*, 491, for absence from executing his office from the 10th of June to the 12th of August, his plea that he was in prison, and in execution at the King's suit, would have been a valid defence, if the absence from office, caused by the King's imprisonment, had been *without the defendant's previous default*. There was question, as the imprisonment proceeded from defendant's default in not paying a debt, and even this question was avoided; "there being many other

causes of forfeiture of his office, it was conceived the King should not give evidence" of his mere absence.

In the *Presb. Church vs. City of N. Y.*, 5 *Cow.*, 538, if the city of New York, instead of being defendant, had been plaintiff, suing for breach of the covenant by the lessee to use the premises as a cemetery, its own legislative Act, preventing such use, would have been a complete answer to the suit.

The principle is, that "if the obligee himself be the cause that the obligation cannot be performed, this is no forfeiture; for it is his own act." 5 *Vin. Abr.*, 246, *tit. Condition, pl.* 23. This principle equally applies, whether the proceeding be by an individual or by the King, the State or the people ; the rule as to what is a sufficient performance, or a sufficient excuse for non-performance, being the same in all cases, and governing where the proceeding is by a *scire facias* or information in the nature of a *quo warranto*, just as much as in any other case. *Thompson vs. The People*, 23 *Wend.*, 586.

V. "It must be remembered that forfeitures are odious, and that the law not only construes with great strictness statutes imposing them, but always lays hold of every *act of waiver* to relieve against them." Lewis, C. J., in *Erie & N. E. R. R. Co. vs. Casey*, 1 *Grant*, 278. There may even be "a *tacit waiver* of the performance of a condition subsequent." *Kellogg vs. Union Co.*, 12 *Conn.*, 19. The allegation in the *scire facias*, that the defendants have wilfully and *for a long time* neglected and failed, &c., is on the third plea, to be considered in connection with the statute of Maryland, in the Code, p. 397, Art. 57, sec. 10, and the principle that the State may waive any breaches, *Com. vs. Union Ins. Co.*, 5 *Mass.*, 232 ; *State of Maryland vs. Balt. & Ohio R. R. Co.*, 3 *How.*, 552. By the third plea, we set up the Act of the 10th of February 1839, as recognizing the turnpike company as a corporation legally

existing, and precluding the State from setting up as a ground of forfeiture what existed then, just as much as during the year next preceding the commencement of this suit. *People vs. Manhattan Co.*, 9 *Wend.*, 379, *et seq. Erie & North East R. R. Co. vs. Casey*, 1 *Grant*, 282, 283. *Canal Co. vs. R. R. Co.*, 4 *G. & J.*, 122. *Atty. Gen. vs. Petersburg & Roanoke R. R. Co.*, 6 *Iredell*, 469.

It being clear that the sovereign authority may determine "when violations of a charter shall be overlooked," (*Board of Com. vs. The State*, 9 *Gill*, 404,) even if the other side could show that the Act of the 10th of February 1839, does not amount to such recognition and admission as is claimed by the third plea, this could not avail them on the fourth plea. On this plea the cases of *The People vs. Kingston & Middleton T. P. Co.*, 23 *Wend.*, 193, and *The People vs. Phœnix Bank*, 24 *Wend.*, 432, cannot avail them. If they refer to particular Acts of Assembly, and argue that they do not amount to such admission, or if they argue that there was, in fact, no admission beyond what is contained in the Act of February 10th, 1839, the answer is, that any such matter of fact might have been inquired into on a replication, but is not open to inquiry on a demurrer. On the demurrer to the fourth plea, the Appellate Court must consider it to be matter of *fact*, that the *State of Maryland*, by Acts of its General Assembly, and conduct of its officers, *has admitted*, that until the — day of ——, 1858, said turnpike road was maintained and kept in sufficiently good order and repair, and *has admitted* that until the time last mentioned, no sufficient cause existed for vacating and annulling its charter and corporate powers and franchises. And on this demurrer the Appellate Court must consider it to be also matter of *fact* that "by such admissions stockholders in the said turnpike company were, at the time last mentioned, enabled to make an agreement to sell, and other persons were, at the same time, induced to make an agree-

264 MARYLAND REPORTS.

The Pres., Man. & Co. of the Wash. & Balto. Turnpike Road, *vs.* The State.

ment to purchase, at a large price, to wit: the price of $16,000, 1,540 shares of stock in the said turnpike company, and pursuant to such agreement, to wit: on the 1st day of October 1858, the said price was paid, and the said 1,540 shares of the stock transferred.''

Now it is a rule of law, that ''where one, by his words or conduct, wilfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time.'' *Pickard vs. Sars, &c.* 6 *Adol. & El.*, 469, 33 *Eng. C. L.; Gregg vs. Wells,* 10 *Adol. & El.*, 90, 37 *Eng. C. L.; Cornish vs. Abington,* 4 *H. & N.*, 549; especially *Pollock, C. B.*, 555, and *Bramwell, B.*, 556; *Sergeant's Excrs. vs. Ewing,* 30 *Penn.*, (6 *Casey,*) 81. What, then, is shown here?

The fourth plea expressly alleges, and the demurrer admits it to be matter of *fact*, ''that the said transfer was made and the purchase money paid upon the faith of the admission by the State of Maryland, that while the said turnpike road was maintained and kept in as good order and repair as it was at the time of the agreement to purchase, the State of Maryland would consider that no sufficient cause existed for vacating and annulling the chartered and corporate powers and franchises.'' And then the fourth plea avers, and the demurrer thereto admits, ''that soon after the said transfer, the said turnpike road was put in better order and repair, and during the whole of the year next preceding the commencement of this suit, the said turnpike road has been in better order and repair than it was at the time of the said agreement to purchase.'' Upon these facts, alleged by the defendants, and admitted by the plaintiff to be true, the language of Ruffin, C. J., is in point: ''Surely,'' he says, ''it would not comport with the good faith that should actuate every government, if

the State were to turn around, immediately after inducing this further expenditure by the company, and getting the work done, and insist upon a forfeiture." *Atty. Gen. vs. Petersburg & Roanoke R. R. Co.*, 6 *Iredell*, 470.

VI. The second and fifth pleas also draw in question the construction of a clause of the Constitution of the United States, as well as of the Constitution of the State of Maryland; and the validity of authority exercised under the State of Maryland, on the ground of its being repugnant to the Constitution of the United States. In connection with these pleas, it may be proper to refer to the Acts of 1828, ch. 139, sec. 20, and 1812, ch. 78, sec. 11, and the case of *Erie & N. E. R. R. Co. vs. Casey*, 1 *Grant*, 294, 295 and 298. Surely the right claimed by the defendants could be effectually set up against a statute of the State of Maryland, which, in plain and direct terms, either repealed our charter, or prohibited tolls from being received on the turnpike. Suppose, in the latter case, that after taking from the company the means of keeping its road in good order and repair, the State had, upon the ground of its not being kept in good order and repair, proceeded by *scire facias* to vacate and annul the charter, might we not well say that, under such circumstances, to forfeit the charter would be to impair the obligation of the contract, and take private property for public use, without just compensation? Could this defence be met by telling us "that such a term is never applied to the judgment of a Court over a subject matter within its jurisdiction?" The answer is, that the obligation of the contract is impaired by a law of the State, when by means of an authority exercised under that law there is, without our consent, taken from us what we were entitled to under the contract. What the company was entitled to, under its contract with the State, is taken away, when the State, through one department of its government, deprives the company of the

34      v.19

means of keeping its road in order, and then, through another department, pronounces judgment of forfeiture against the company for not keeping it in order. Such a judgment would be forbid by the first principles of justice, as well as by the Constitution of Maryland and the Constitution of the United States. And if, after taking from the company its whole income, the State would have no ground to complain of it for not keeping its road in order, neither has it any better ground of complaint, when it has taken from the company part of its income, and with the remainder the road cannot be kept in any better order than it now is. If the former would not be consistent with the Constitution of Maryland, or of the United States, neither would the latter. And the case is still stronger, when we look to the allegations as to the demise in the fifth plea.

Nor will this doctrine require the existence of roads impassable and dangerous, or prevent better improvements, either by the State herself or by another company. *Boston Water Power vs. Boston & Worcester Rail Road,* 23 *Pick.,* 393. *Central Bridge Corp. vs. City of Lowell,* 4 *Gray,* 481. "If it come to this, that public faith is to be violated, or the benefit of such improvements lost," the Supreme Court of Connecticut has well said, "banish the improvement! The community will profit more by preserving public faith, than they will gain by its violation; although for a time it may seem otherwise." But the Court believes that neither course need be taken. It thinks "there is a conservative principle by which the improvement may be made, and good faith preserved. It is this: that private property may be taken for public use, upon compensation made." *Enfield Toll Bridge Co. vs. Hartford & New Haven Rail Road Co.,* 17 *Conn.,* 58, 59. Notwithstanding there was an information in the nature of a *quo warranto,* the Court would not, when there was no provi-

DECEMBER TERM, 1862.　　　267

The Pres., Man. & Co. of the Wash. & Balto. Turnpike Road, *vs.* The State.

sion for compensation, allow the charter to be invaded, in *Washington Bridge Co. vs. The State*, 18 *Conn.*, 53.

VII. The Act of 1860, (directing the State's Attorneys to institute proceedings in the name of the State, to ascertain whether the charter and corporate powers and franchises ought, by reason of non-user or abuser, to be declared to be vacated and annulled,) directed what, in the language of Blackstone, "is properly a criminal method of prosecution," 3 *Bl. Com.*, 263; and under the Constitution of Maryland (Art. 4, sec. 11) it should not have been in the Superior Court of Baltimore city. The Court, therefore, erred in sustaining the demurrer to the additional plea mentioned.

A reversal upon any one of the points so far made, will be sufficient to put an end to this case. There are other points sufficient to cause the judgment to be reversed, the verdict to be set aside, and other proceedings to be had. Thus:

VIII. There was error in striking out the 8th plea, founded on the Code, p. 397, Art. 57, sec. 10. Even in an action on contract, the view of the statute of limitations is different in England, (*Rucker, &c., vs. Hannay*, 3 *T. R.*, 124; *Maddox vs. Holmes, &c.*, 1 *Bos. & Pul.*, 228;) and in Virginia, (*Tomlin's Adm'r vs. How's Adm'r, Gilm.* 7,) from that taken in *Wall vs. Wall*, 2 *H. & J.*, 79; *State vs. Green*, 4 *G. & J.*, 384; and *Nelson & Wife vs. Bond*, 1 *Gill*, 218. But the present is very different from those cases. In such a case as this—a proceeding to enforce a forfeiture—the plea, under the circumstances appearing on the record, should be regarded as a plea to the merits. And even if the other pleas had been previously filed, the 8th should have been received under the broad power (given by the Acts of 1785, ch. 80, and of 1809, ch. 153, sec. 1, and extended by the Code) to allow amendments before verdict, so as to bring the merits fairly to trial. From what the

defendants are entitled to under the statute, they are not to be debarred by any rule that is the mere creature of the Court. *Union Bank vs. Ridgely,* 1 *H. & G.,* 407: Besides, the plaintiff, not having filed a declaration, did not bring himself within the rule. *Kent vs. McEldery,* 9 *Gill,* 493.

IX. Taking the Act of 1860 in connection with the general law of Maryland, the 2nd bill of exceptions shows error in admitting evidence of "want of repair of the defendant's road, in parts thereof, lying outside of the limits of the city of Baltimore."

X. Whether the proceeding be a prosecution or a suit, the Code (p. 397, Art. 57, sec. 10) requires it to be commenced within one year from the time of the offence. The plaintiff is to show that it was commenced within the year; and the defendant may take advantage of the statute on the general issue, and need not plead it. 2 *Wms. Saund.,* tit. 63, *note* (6.) *Peake's Ev,, ch,* 5, *sec.* 1, *pp.* 273, 274. *Stark Ev., Penal Action, part* 4, *pp.* 1123, 1128. It was, therefore, plainly an error for the Court to admit—as the 3rd bill of exceptions shows it did—evidence of "want of repair of the defendant's road, existing more than one year before the commencement of this prosecution."

XI. Was Wartman, the witness named in the 1st bill of exceptions, a person disinterested? 10 *Mod.,* 193. Can it be maintained he was not "in any sort interested in the matter to be tried?" 3 *Burr.,* 1857. In England, in an action against the hundred, house-keepers within the hundred were not allowed as witnesses, though they paid no taxes nor parish duties. It was so laid down in 29 *Car.,* 2; 1 *Mod.,* 73, 74; and again in 12 *Ann, Queen vs. Inhabs. of Hornsey,* 10 *Mod.,* 150. In the case of the *Water Bridge of London,* a freeman of the city, though it was not sixpence concern to him, could not be admitted as a witness. So we are told in 1684, in *Corp. de Sutton Coldfield vs. Wilson,* 1 *Vern.,* 254. In 3 W. & M., on an information

for not repairing a highway between S. & B., evidence was rejected of witnesses who lived in either of said parishes of S. or B. *Rex & Reg., vs. Buckeridge, &c.*, 4 *Mod.*, 48, 49. In 1694, in a suit touching the loss and misapplication of a sum of money given for the benefit of the parishioners, the question being whether any inhabitant of the parish ought to be admitted as a witness, it was argued that the interest was so minute and inconsiderable that it could not be presumed to influence the witness, or bias him in his evidence. But the Court said: "The cases where the party was concerned in interest, though never so small, have always prevailed, and it was so resolved upon great debate in the case of the city of London, concerning the water bailiff." *Dowdeswell vs. Nott*, 2 *Vern.*, 317. So in 1719, a charity being given for the clothing of six persons of the parish of E., the Lord Chancellor would not suffer any of the inhabitants of E. to be witnesses, because they were interested as being eased in their poor rates. *Atty. Gen. vs. Wyburgh, &c.*, 1 *P. Wms.*, 599. In 12 *Will.*, 3, "a house-keeper who pretended the like interest before his door, though he derived his title from under another person, was denied to be a witness." *Farmers of Newgate Market vs. Dean, &c., of St. Pauls*, 12 *Mod.*, 372. And in 1697, '98, Holt, C. J., ruled that if the prescription be, that all the inhabitants of Blackacre ought to have common there, one of the inhabitants cannot be a witness to prove that another of said inhabitants ought to have common there, because in effect he would swear to give himself right of common there. *Hockley vs. Lamb*, 1 *Ld. Raym.*, 731.

In England, material changes as to competency of witnesses, have been made by statute. For example, the Stat. of 1 Ann, ch. 18, sec. 13, provides that, upon the trials of indictments and informations against individuals for the non-repair of bridges, the inhabitants of the town, corpo-

270 MARYLAND REPORTS.

The Pres., Man. & Co. of the Wash. & Balto. Turnpike Road, *vs.* The State.

ration, county, &c., where the bridge is, are competent witnesses. But there is no such statute in Maryland; and hence decisions upon the common law rule, as to competency, are as pertinent in Maryland now, as they were in England before such statute. Moreover, the rule of *Hockley vs. Lamb* was affirmed in 1 Geo. I, in *Reeves vs. Symonds*, 10 *Mod.*, 292. Again, in 10 Geo. I, one who had a burgage tenure, and also inhabited in the borough, could not be a witness to prove a right in himself, and in such as had his qualifications exclusive of all others. *Stevenson vs. Nevinson*, 2 *Ld. Rym.*, 1353.

In the present case, the objection to the witness is as decisive as the objection to the witness in *The Company of Carpenters vs. Hayward*, 1 *Dougl.*, 374. For, in the event of a judgment against the company, the witness would be discharged from tolls and actions to which he would otherwise be liable. This case, and others on the same principle, are recognized in 2 *Stark. Ev.*, *part 4*, *tit. Corporation*, *p.* 427; and in *Greenl. Ev.*, *part* 3, *ch.* 2, *sec.* 405. Nor does the exception apply, that "a party interested will be admitted when no other evidence is reasonably to be expected." *Bull, N. P.*, 289. For as Buller, J., said of the party in *The Company of Carpenters vs. Hayward*, it is not true that he could have had no other sort of witnesses. And, therefore, the present case is distinguishable from *Lancum vs. Lovell*, 9 *Bingh.*, 465, 23 *Eng. C. L.*

XII. If the Court, on the one hand, went far in overruling objections to the competency of witnesses, it should, on the other hand, not have restricted the cross-examination. 1 *Stark. Ev.*, *part* 2, *sec.* 17, *p.* 129. 1 *Greenl. Ev.*, *part* 3, *ch.* 3, *sec.* 445. The question here, was no less proper than those allowed to be put in England, in *David vs. Grenfoll, &c.*, 6 *C. & P.*, 624, 25 *Eng. C. L.*; in New York, in *Mechanics & Farmers Bank vs. Smith*, 19 *Johns.*, 123, and *Lower vs. Winters*, 7 *Cow.*, 265; in Pennsylvania,

in *Cameron, &c., vs. Montgomery*, 13 *S. & R.*, 132; and in Maryland, in *Crawford vs. Brooke*, 4 *Gill*, 220, and *Burck-myer vs. Whiteford*, 6 *Id.*, 13.   We are told by Lord Denman, C. J., that "everything that comes out at a trial is material, if it goes to the credit of the witness;" and by Lord Abinger, C. B., that "every question of cross-examination which goes to the credit of the witness, is material," *Regina vs. Overton*, 1 *Car. & Marshm.*, 659, 41 *Eng. C. L.;* and by Sutherland, J., in delivering the opinion of the Court in *Lower vs. Winters,* that "great latitude is allowed upon the cross-examination of witnesses."   In *Cameron, &c., vs. Montgomery*, a witness for plaintiff was asked by defendants, on his cross-examination, whether plaintiff had any property of his under his care, to cover it from his creditors.   Having answered that he had not, defendant's counsel proposed to ask witness whether plaintiff did not buy witness' real property at his instance.   The Court below erred in not permitting the question to be put; and for this error the judgment was reversed.   The Court said: "If the plaintiff did buy the defendant's property at his instance, it was a circumstance which might show that the witness was under an obligation to him, and this might have some effect on his evidence.   A party against whom a witness is produced, has a right to show everything which may, in the slightest degree, affect his credit."   In the present case, had the Court allowed the witness to be examined as to the details of his plan, and his expectations of profit, the jury would have been better able to judge how far his testimony might be biassed by the hope of profit.   Moreover, the answer might have been material, not only as to credibility, but also as to competency.   True, the witness had been examined in chief, yet if in the course of the case it appeared that he was really interested, the objection to his competency might still have been taken.

1 *Stark. Ev.*, part 2, sec. 11, *p.* 122.　1 *Greenl. Ev.*, part 3, *ch.* 2, sec. 421.　*Dent vs. Hancock,* 5 *Gill*, 128.

XIII. "On the general issue, the plaintiff must prove the whole of his case." 2 *Tidds. Pr.*, 849.　*Steph. on Pl.*, *ch.* 2, sec. 3, *rule* 1, *p.* 278.　The *scire facias* alleging that the defendants "have *wilfully* and for a long time neglected and failed to keep their road, &c., in good order and repair," and as already stated, the allegation of *wilfulness* being material, issue was taken on this allegation, and evidence was admissible to prove or disprove it. *Lush vs. Russel,* 5 *W. H. & G.*, (*Excheq.*,) 203.　Now the fifth bill of exceptions shows that the plaintiff "offered evidence to the jury, tending to show the *wilful* neglect of the defendants to keep its road in repair;" but when the defendant offered evidence to show there was no *wilful* neglect, his evidence was rejected! The error is obvious, and the injurious consequences of it manifest, when we see that the jury found that the defendants "have *wilfully* and for a long time neglected and failed" to keep their road, &c., in good order and repair. No such verdict could have been found if, against the evidence offered on one side, rebutting evidence had been admitted on the other side. See *Garner vs. Smith,* 7 *Gill*, 4, 5.

XIV. What has been already said, is sufficient to show that the Court erred in giving the instruction mentioned in the sixth bill of exceptions. "A forced construction against the company is not to be adopted." *Kellogg vs. Union Co.*, 12 *Conn.*, 18.　*Boston & Providence R. R. Co., vs. Midland R. R. Co., &c.*, 1 *Gray*, 340.　The charter is a contract between the Government on the one part, and the undertakers accepting the Act of incorporation on the other; and, therefore, what they both intended by the terms used, if we can ascertain it, forms the true construction of such contract. *Boston & Lowell R. R. Co. vs. Salem & Lowell R. R. Co.*, 2 *Gray*, 29.　Was it intended by

both parties that the charter and corporate powers and franchises should be annulled, or liable to be annulled, if, over waters crossing the road, there was a failure to maintain and keep *bridges* in good order and repair? Surely not. So to hold, would be a forced construction of the thirteenth, and utterly inconsistent with the fourteenth section of the charter; a duty is only prescribed with regard to the *road* itself. Again, as to the road itself, was it intended by both parties that the charter and corporate powers and franchises should be liable to be annulled if the road had, on *any one day,* come short of the precise state of order and repair in which it was required to be when gates were first erected on it? Such a construction is forbid by the twenty-sixth section, under which the inquisition would have to find it to be "out of order and repair," (that is, "not in a good state of general repair;" *People vs. Bristol & Rensselaerville T. P. Co.,* 23 *Wend.,* 232,) "*for the space of fifteen days,*" at least. Unless the charter and corporate powers and franchises can be vacated and annulled for what would be insufficient to maintain a proceeding under the twenty-sixth section, it is impossible to sustain the instruction which required the jury to find a verdict for the plaintiff, if they believed "that the defendant had, *at the time of the passing of the Act of* 1860, ch. 326, given in evidence, failed and neglected to maintain and keep their road, or parts thereof, and the bridges over the streams crossing said road, in good order and repair."

XV. If the Court below could only do what was authorized by the Act of 1860, its judgment was clearly without authority. If it be said that it has a general jurisdiction in civil cases—that it sets in place of the King's Bench in England—still it could only exercise such jurisdiction and give such judgment as the King's Bench was authorized to exercise and give at common law. And at common law, on a *scire facias,* there could not be rendered such judg-

35    v. 19

ment as has been given in this case. *Foster on Scire Facias*, 272. Even in a case in which a *scire facias* would lie, as to vacate a patent, the Court might, after conviction, suspend the entry of judgment to vacate the patent. *Bynner vs. Regina,* 9 *Adol. & El.,* N. S., 532, 533, 58 *Eng. C. L.* Then if we look to the proceeding by information in the nature of a *quo warranto*, it appears that even after the Statute of 9 Ann, ch. 20, judgment of ouster was not a matter of course. *The King vs. Taylor,* 2 *Barnard.,* 238, 280, 316, 320. It certainly could not have been before that statute. Sir Dudley Ryder's view of the law as it was before that statute, is stated in *Rex vs. Ponsonby, &c., Sayer,* 245; the judgment in which case was affirmed in the House of Lords, 2 *Brown, Par. Cas., p.* 319, *of Tomlin's ed.* It being competent to the State to pardon a forfeiture and to grant restitution where things remain *in statu quo,* (*The King vs. Amery,* 2 *T. R.,* 568, 569,) the Court should, after the verdict, have let things remain *in statu quo,* until the Legislature could consider the subject. It was certainly erroneous to give judgment for costs. *The King vs. Miles,* 7 *T. R.,* 363.

In every aspect the judgment is clearly erroneous, and should be reversed.

*J. Prentiss Poe* and *R. J. Gittings,* for the appellee:

I. The writ of *scire facias* is the appropriate proceeding whereby to ascertain whether a corporation has forfeited its charter by *non-user* or *abuser* of its corporate powers and franchises. *Mandamus* will not answer, for there the object is to compel a corporation *in esse* to perform some duty imposed upon it by its charter. Here the object of the proceeding is not to compel the corporation to repair its road and maintain it in good order, but to vacate and annul its charter, because of its failure to do so. *Quo warranto* is not the proper proceeding, because that properly applies

where there is a corporate body, *de facto* only, but which takes upon itself to act, though from some defect in its constitution or organization, it cannot legally exercise its powers. *Scire facias*, on the other hand, is resorted to to ascertain and enforce the forfeiture of a charter, when there is a legally existing body capable of acting, but which has abused its powers. Such is the case here alleged by the appellee.

The writ, it is true, can only be issued at the instance of the State, and violations of a charter cannot be taken advantage of in a collateral proceeding; for the State, with whom the contract is made, may not wish to enforce a forfeiture, and may, if she chooses to do so, waive the breach of any condition of the contract arising out of the charter. The law upon this point is now well settled in Maryland. Act of 1832, ch. 306. Act of 1845, ch. 75. *Board of Com., &c., vs. The State*, 9 *Gill*, 379. *Regents of University, &c., vs. Williams*, 9 *G. & J.*, 365 and 426. *Planters Bank vs. Bank of Alexandria*, 10 *G. & J.*, 346. *Can. Co. vs. R. R. Co.*, 4 *G. & J.*, 121 and 122. *King vs. Pasmore*, 3 *Term Rep.*, 199 and 224. *Ang. & Ames on Corp.*, t. p. 891. *Slee vs. Bloom*, 5 *Johns. Ch. Rep.*, 366. *Eastern Archipelago Co. vs. Regina*, 22 *Eng. Law & Eq. Rep.*, 328. *Foster on Sci. Fa.*, 12.

If it be said that the decisions in Maryland upon this subject, since the Act of 1832, were made with reference to the provisions of that law, it may be replied, that the case of *The Can. Co. vs. The R. R. Co.*, 4 *G. & J.*, 121, where the same doctrine is declared, was decided before its passage. That Act, it will be maintained by the appellee, was declaratory only, and its omission from the Code is entirely immaterial, so far as this case is concerned.

The English cases relied on by the appellants, to show that the remedy by *scire facias* is inappropriate, do not apply to such corporations as exist in this country. We have

in this State no other corporations except those chartered by the Legislature, and if *scire facias* were not a proper form of proceeding to ascertain whether they have forfeited their charters, they would be entirely beyond the reach of judicial inquiry into their acts. All that is necessary in Maryland to authorize such a proceeding, is the assent of the Legislature. Such assent has been expressly given by the Act of 1860, ch. 326; and though it does not specify in terms the precise form of proceeding to be adopted, the practice and authorities all show that the one resorted to here is the only appropriate one.

II. The first six pleas do not profess to deny that the road is not in the condition of repair required by the charter. That is done by the ninth plea. But they set up, 1st, excuses for their failure to maintain it in good order; 2nd, a waiver on the part of the State of that breach of their charter; and 3rd, it is averred that because of the hypothecation by the company of its tolls and revenues to parties who had become its creditors upon the faith of that hypothecation, it is exempted from all liability for that breach.

A demurrer admits what is pleaded, provided it is well pleaded. *Neale vs. Clautice,* 7 *H. & J.,* 378. But all the pleas in this case are defective. 1 Code, Art. 75, sec. 2. Each one of them is an argument, is double, and states matters of evidence. *Steph. on Pl.,* 257 and 258. They are all objectionable in form; they do not confess and avoid, nor do they deny and traverse. But even if well pleaded, they are not answers to the *scire facias. Charles River Bridge vs. Warren Bridge,* 11 *Peters,* 544 and 545.

1st. The first and second pleas present the proposition, that because the State, in the exercise of its sovereign powers, undertook to authorize the building of a railroad between the same termini as those of a turnpike company previously incorporated by her, and because the building

of said railroad was followed by a loss of revenue by the turnpike company, therefore the turnpike company is relieved from the obligations imposed upon it by its charter, and the State is disabled from instituting and prosecuting an inquiry whether the company has complied with those obligations, or disregarded them.

We do not understand that the appellants question the right of the State to charter as many railroads or turnpikes as she sees fit, between any termini within her jurisdiction. Such right has been authoritatively settled, and is now universally conceded. *Charles River Bridge vs. Warren Bridge*, 11 *Peters*, 420. *Balto. & O. R. R. Co. vs. Washington & Balto. Turnpike Road*, 10 *G. & J.*, 292. *Pierce on Railway Law*, 20.

But we understand their proposition to be, that the exercise of such admitted right by the State, disables her from enforcing, through her Courts, the forfeiture of the charter of a corporation, whenever that forfeiture can be indirectly traced to such exercise. In other words, the State cannot exercise one of her admitted rights in a case like this, without stripping herself of another right, which would otherwise be equally indisputable. We, on the contrary, maintain that the State cannot, by exercising one right, lose the benefit of another right; that the surrender by her of a great police power, is never to be presumed, and that the exercise of such a power cannot be attended with the restrictions with which the argument of the appellants would fetter her; that the contract entered into with her by the appellants was absolute; that their poverty, their loss of revenue, and their consequent inability to keep their road in the repair required by the terms of their charter, (no matter whether that inability be indirectly caused by the act of the State, or be an inability *per se*,) so far from being an excuse for a failure to comply with the conditions of their charter, is a cogent argument why their corporate

rights and franchises should be vacated; that it is immaterial whether their failure be wilful or unintentional, the effect in either case is the same, the conditions of their contract are equally broken, the end of the institution is defeated, and the charter must cease to exist. The consequence of the argument, that an inability to keep the road in good order, owing to want of means, relieves the company from the duties imposed upon it by its charter, would be that the State would be obliged to permit the existence of roads impassable and even dangerous. Such, it may safely be asserted, is without support from authority.

In fact, the conclusion would seem to be inevitable, that if (as is conceded) the State can authorize the construction of a railroad anywhere within her jurisdiction, such authority is absolute, and can impose upon her no restriction, no loss of any other of her sovereign rights and powers, and cannot operate to close the doors of her own Courts against her, when she wishes to inquire into the delinquencies of a corporation created by her, and responsible to her. *Angell & Ames on Corporations*, sec. 776. *People vs. Bristol Turnpike Co.*, 23 *Wend.*, 236. *Charles River Bridge vs. Warren Bridge*, 11 *Peters*, 444.

2nd. Assuming the road not to be in repair, and the excuses set up not sufficient, and their inability, even with the use of all their means, not a good defence to the action, the third and fourth pleas set forth facts going to show a waiver by the State of all causes of forfeiture.

An examination of them will disclose no sufficient ground for presuming a waiver. It is plain that such was not the intention of the Act of 1839, relied on in the third plea— and even if it were, it would not apply to and cover violations of the charter happening long afterwards. The rule is, that as against the State, no waiver can be presumed, unless a clear intention to waive the forfeiture, with a full knowledge of the facts, can be gathered from the legisla-

tion relied on to prove such intention. A simple recognition of the existence of the corporation is wholly insufficient. The Act of 1839 makes no allusion to the condition of the road, but merely directs the Court of Appeals, at its first term thereafter, to hear and determine the then pending appeal between the railroad company and the turnpike company. It is unreasonable to infer that thereby the State designed to disable herself from the inquiry as to whether the turnpike company had or had not complied with the terms of its charter.

Moreover, to maintain that such an act is a waiver of any cause of forfeiture happening up to that time, and then to argue that the charter cannot be vacated, because the road is now (as the plea states) in as good order as it was then, is to make the condition of the road at that time, and not the charter, the standard of the obligations of the appellants for all time. Such, of course, cannot be the true measure of their liability. It is to the charter, and the charter alone, that we must look for the character and extent of their rights and duties. Nor would it by any means follow, that because the State did not choose, in 1839, to enforce a forfeiture, she designed to declare that so long as the road was maintained as it then was, the company should be unmolested.

The fourth plea insists that the conduct of the State, up to 1858, amounts to a waiver; that is, that the silence of the State, her failure to authorize proceedings against the company, is to be held equivalent to a declaration that no cause of forfeiture had occurred. This, obviously, does not come up to the terms of the rule we have stated above.

To give to the Act of 1839 the construction contended for by the appellants, would be to invest a collateral act, done, it may be, in ignorance of the true condition of the road, with a character which such an act, done by an individual, would not possess, and to hold the silence of the

State from 1839 up to 1858, to be a conclusive argument against her present right to revoke franchises, when the conditions are forfeited on which those franchises were granted, would be to make the long continued clemency and forbearance of the State, the means of destroying her rights and restricting her powers. *Angell & Ames on Corporations,* sec. 777. 6 *Iredell,* 470, *Atty. Gen. vs. Petersburg & Roanoke R. R. Co.* 24 *Wend.,* 432, *The People vs. Phœnix Bank.* 1 *Greenleaf on Evidence,* sec. 197. 7 *Gill,* 354, *Claubaugh vs. Byerly.*

3rd. The hypothecation of the tolls and revenues of the company to certain creditors, is, in the fifth and sixth pleas, asserted to be a bar to the action. These pleas aver that it would be taking private property for public uses, without just compensation, for the State to vacate the charter during the continuance of the contracts with the creditors named therein, and that therefore the action cannot be maintained. On the contrary, it will be contended for the appellee that Messrs. Robinson & Savage must be held to have contracted with the company with a knowledge of the liability of the company to be subjected to such a proceeding as this. It is not a taking of private property for public uses without compensation, for a Court in a proceeding authorized by the State, to adjudge a forfeiture of a charter. Such a term is never applied to the judgment of a Court over a subject matter within its jurisdiction; it is in no sense a judicial act. Besides, it is always in the power of a corporation to prevent such a forfeiture, by acting up to the terms of its charter, and complying with its obligations. The destruction of its franchises is the legitimate fruit of a wilful and persistent or an unintentional failure to answer the ends of its creation; and if such destruction carries with it a loss to any parties who have incurred liabilities for the corporation, or become its creditors, it is a result with reference to which they

must be presumed to have contracted, and they cannot complain.

If the existence of such a contract as is averred in the 5th and 6th pleas, can shield a corporation from the consequences of the abuser or non-user of its franchises, all it has to do in order to perpetuate itself, and to give itself a license to disregard and set at naught its obligations, is to involve itself in debt, and when called on to answer for its failure to perform its corporate duties, its indebtedness will be received as a conclusive bar to any attempts to vacate its charter. The propriety of the action of the Court below in sustaining the demurrer to these pleas, is fully supported by the decision in *Mumma vs. The Potomac Company*, 8 *Peters*, 287.

The seventh plea also furnishes no reason why the charter should not be annulled. The Act of incorporation imposes certain obligations upon the appellants, and does not in any of its sections contemplate releasing them from such obligations, because of their failure to receive tolls sufficient to enable them to meet them. The charter was accepted by the appellants, and no good reason can be assigned why they should enjoy its benefits without bearing its burdens. If they cannot keep the road in repair, they have no right to exact tolls; if it yields no sufficient revenue, if the expenditure of *all* its tolls is inadequate to maintain the road as the charter required it to be maintained, it surely is no hardship to deprive the appellants of that which is only a burthen to them. For these reasons the demurrer to the first seven pleas was properly sustained.

III. The eighth plea was properly stricken out, for the reason assigned in the motion. *Cherry vs. Baker*, 17 *Md. Rep.*, 75. Moreover, limitations will not run against the State. Art. 57, sec. 10, of the Code, relied on by the appellants, does not apply to a case like this. *People vs.*

*Bristol Turnpike Co.*, 23 *Wend.*, 236. *Commonwealth vs. Wray*, 3 *Dallas Penn. Rep.*, 490.

IV. The demurrer to the additional plea to the jurisdiction, was also properly sustained. The reasons already given under our first point, to show that *scire facias* is the proper remedy, are sufficient to maintain the correctness of this ruling. It is not a criminal proceeding, but is a civil case, instituted only by the State, and prosecuted as other civil suits are. The Act of Assembly authorizes the action to be begun, and being a civil suit, it is in the city of Baltimore, according to the Constitution, properly brought in the Superior Court. Constitution, Art. iv., secs. 10 and 11. *Commonwealth vs. Wray*, 3 *Dallas Penn. Rep.*, 490. *Commonwealth vs. Comms. of Philad. Co.*, 1 *Sergt. & Rawle*, 335. There is nothing in the charter to take away this remedy. The remedy given by the charter is only cumulative. *Eastern Archipelago Co. vs. Regina*, 22 *Eng. Law & Eq. Rep.*, 342 and 344. *People vs. Bristol Turnpike Co.*, 23 *Wend.*, 244.

As to what is such an abuse of a charter as will justify its being forfeited by the State, see *People vs. Kingston & Middletown Turnp. R. Co.*, 23 *Wend.*, 205; *People vs. Bristol Turnpike Co.*, *Id.*, 236 and 249 to 252.

V. The witness, Wartman, had no such direct, certain and legal interest in the suit or in the record as to render him incompetent. 1 *Greenlf. on Ev.*, secs. 386, 390, 411 and 412. 3 *Phil. Ev.*, 105. *Crawford vs. Brooke*, 4 *Gill*, 218. *Lancum vs. Lovell*, 9 *Bing.*, 465. Forfeiting the charter closes the road, and the land reverts to the original proprietors, their heirs or assigns. Such is the legal effect of the judgment in this case.

VI. Nor was the ruling of the Court in the 2nd exception erroneous. The Act of Assembly did not give the Court jurisdiction; it simply directed the proceeding to be instituted, and having been once instituted, and the case

regularly upon trial, the question involved was *forfeiture vel non*, and the Court had a right to inquire into the condition of the road through its entire length and breadth. A franchise is an entirety. There is no reason why the inquiry should be limited to the city of Baltimore. With quite as much reason might it be contended, that where the Baltimore & Ohio Railroad Company was in Court as defendant, it would be incompetent to prove anything occurring on the road beyond the city limits. Moreover, the Legislature never intended that the proceeding should be so restricted, for it authorized the suit to be brought in Anne Arundel county, through which no part of the road passes at all.

VII. The third exception presents the single question of limitations, already disposed of under the motion to strike out.

VIII. The question proposed to be asked of Mr. Rittenhouse, in the fourth exception, was irrelevant and properly disallowed. Its answer could have no bearing whatever upon the issues in the case. 1 *Greenlf. on Ev.*, sec. 449.

IX. The evidence offered in the 5th exception, and rejected by the Court, is simply evidence of the facts recited in the first, second and seventh pleas, admitted to be true by the demurrer, and held to be no bar to the action. Of course the evidence here offered and rejected, was properly rejected, if the ruling of the Court on the demurrers was correct. That such ruling was correct, we have already endeavored to establish.

X. The sixth exception brings up the instruction given by the Court below. It is wholly free from error, for it merely puts to the jury, that if they find from the evidence that the defendants had failed to comply with the terms of the 13th section of their charter, then the plaintiff was entitled to a verdict. It is regular in form and substance, places the facts before the jury for their decision, and sub-

mits no question to them which it was not their province to decide.

XI. The motion in arrest was properly overruled. In support of the motion, it is argued that the writ of *scire facias* is invariably founded upon a record, and inasmuch as there is in this case no record, the action is not well taken. In reply to this, it is only necessary for us to refer to what has been already said under our 1st point. From that it will appear that the form of proceeding instituted is the only one which reaches the case. This view is fully borne out by the authorities.

It is further argued, that the only jurisdiction which the Court has over the case, is conferred upon it by the Act of 1860, ch. 326; that this jurisdiction is limited, and must be strictly pursued; and that inasmuch as the terms of the Act only authorize "the State's Attorneys to institute proceedings in the name of the State, to ascertain whether the charter and corporate powers and franchises of said President, Managers and Company ought, by reason of non-user or abuser of such powers or franchises, to be declared to be vacated and annulled," the duty of the Court is limited to the simple inquiry into that fact; that having done, that the power of the Court is exhausted, and it cannot proceed to enter up a judgment on the verdict; that the object of the proceeding was not intended to be an enforcement of a forfeiture, but merely an inquiry whether any cause of forfeiture existed, leaving the Legislature hereafter to declare what the result shall be.

In reply to this view, it will be contended for the appellee, that the Court below sits in virtue of its common law jurisdiction, to hear and adjudge this case, precisely as it would any other brought before it; that the only object of the Act of 1860, ch. 326, was to give the assent of the State to the institution of the proper proceedings, leaving them, of course, to be selected by her law officers, and not

DECEMBER TERM, 1862.    285

The Pres., Man. & Co. of the Wash. & Balto. Turnpike Road, *vs.* The State

to confer a special limited jurisdiction upon the Court; that the power to hear necessarily involves the power to adjudge, and that the jury having found the issue of fact for the appellee, and the Court having decided the issues of law in her favor, it was bound to carry the case to its close, by rendering the judgment of *ouster*.   The intention of the Legislature is, besides, made abundantly manifest by the title of the Act, wherein it is called an Act to authorize *"proceedings to forfeit the charter"* of the company. The judgment entered up is free from objection, and is similar to that entered up in writs of *scire facias* to repeal letters patent granted by the Crown in England.   *Hindmarch on Letters Patent*, 8 *Library of Law & Equity*, 736.

The case is one of importance and interest, and was carefully considered by the Court below.   For a long series of years, as the pleadings show, the turnpike has been maintained by the appellants in such a condition as at times to amount to a positive nuisance; until at last the State, yielding to the petitions of her citizens, authorized this proceeding to be begun.

The defences are wholly technical, none of them go to the merits, nor does the record contain a particle of testimony to show that the appellants have not utterly failed to comply with their chartered obligations.   It is submitted that the rulings of the Court below are wholly free from objection, and the judgment should therefore be affirmed.

*G. W. Dobbin*, for the appellants, in reply:

The justice of the cause lies entirely with the appellants. Standing on the immutable principles of justice, it is impossible to forfeit this franchise.   It being a case of forfeiture, there must be *moral* and *voluntary* culpability, and in this view this corporation is conceded to be innocent.   The right to incorporate the railroad company is conceded.

The Pres., Man. & Co. of the Wash. & Balto. Turnpike Road, *vs.* The State.

*Wilful neglect* is specified in the Act of 1860 as the cause of the forfeiture, and the proceedings are tied down, and must be tied down to the ascertainment of this fact. The Act does not say that a *scire facias* must issue, but "proceedings *to inquire*," not to judge. It means an *inquiry at bar*, as provided in certain contingencies in the Act of 1832, ch. 306. The Act of 1845, relating to the Frederick Female Seminary, prescribes the character of the judgment, and says what it shall be. The Act of 1860 stops short of this, and does not say what the judgment shall be. 9 *Gill*, 403, dismisses the proceedings, because they were not of the character and in the mode described in the Act of Assembly. *Grant on Corp.*, 318, *t. p. in* 80 *Law Lib.* The *dictum* in the railroad case of C. J. Buchanan, is strictly *obiter.* It is a mere citation from *King vs. Pasmore*, a case upon a royal grant. The cases in 23 *Wend.* do not sustain the position for which they were cited. At page 233 of that authority, it is said that the duty must be designedly omitted, to justify the forfeiture. See, also, 1 *Grant on Corp.*, 295. *Erie & N. E. Railroad vs. Casey*, 26 *Penn. State Rep.* 2 *Casey*, 318.

As to the 4th plea, it is not double. Duplicity is pleading two defences, either of which is a perfect defence to the same cause of action. The admission is the one thing here pleaded, and fifty matters may make up the admission.

The proceeding in this case should have been by criminal information. *Cole on Crim. Inform.*, 56 and 57 *Law Lib.* The proper proceeding for non-repair of a highway, was by indictment. The proceedings should have been in a Criminal-Court, and not in a Court of civil jurisdiction. But we do not rely on this point.

The question of limitations is in our favor. 2 *Saund.*, 62 *c., note* 6.

GOLDSBOROUGH, J., delivered the opinion of this Court:

By the Act of 1812, ch. 78, the appellant was incorporated with authority to make a turnpike road from the District of Columbia to the city of Baltimore. By the 16th section of the Act, the company was authorized to charge the tolls specified therein, as a compensation for their expenditure in establishing the road.

It cannot be doubted that the Legislature, in making this grant, sought to promote the public convenience by the increased facility of travel incident to such an improvement; and the company, in accepting the grant, obliged itself to establish the road to effect this object, and keep the same in repair, in accordance with the requirements of the 13th section of the Act of incorporation.

True it is, that by the 26th section, provision is made for the punishment of the company and its agents, if it shall neglect to keep the road in good and perfect repair; yet it is manifest that this provision was intended to apply only to temporary neglect, and cannot be held to deprive the State of its sovereign power to annul a grant, when the purposes of it have failed through the positive or negative act of the party upon which the grant was bestowed, and when by a proper, legal proceeding, the Court having jurisdiction shall determine, upon evidence, the issue for the State. In 23 *Wendell's R.*, 244, the Supreme Court of New York said: "But it is a rule of almost universal application, that if a statute fixing a penalty for an offence, do not either expressly or by necessary implication, cut off the common law prosecution or punishment for the same offence, it shall be taken to intend merely a cumulative remedy."

It was contended by the appellant, that the Legislature, in bestowing the power granted in the 31st section of the Act, could not, through any tribunal, impair a demise made in view of the grant. This proposition is clearly

erroneous.   In 8 *Peters,* 287, it is laid down, that "a corporation, by the very terms and nature of its political existence, is subject to dissolution by a surrender of its corporate franchises, and by a forfeiture of them for wilful mis-user and non-user.   Every creditor must be presumed to understand the nature and incidents of such a body politic, and to contract with reference to them.   And it would be a doctrine new in the law, that the existence of a private contract of the corporation should force upon it a perpetuity of existence contrary to public policy, and the nature and objects of its charter."

We have confined ourselves thus far to the consideration of the privileges, immunities and liabilities of the appellant under the Act of 1812.

The company continued to enjoy these privileges and immunities, undisturbed, until the institution of the suit in this case, under the provisions of the Act of 1860, ch. 326.

By this Act, the State's Attorneys therein named were directed to institute proceedings in the name of the State against the appellant, to ascertain whether its charter and corporate powers and franchises ought, by reason of non-user or abuser of those powers and franchises, to be declared vacated and annulled.   To carry into effect this Act, a writ of *scire facias* was issued out of the Superior Court of Baltimore city, in the name of the State as plaintiff, against the appellant as defendant.

To this writ the appellant appeared and pleaded the nine pleas mentioned in the record.   The appellee demurred to the first seven pleas, moved the Court that the eighth be stricken from the record, because it was not filed within the time required by the rules of Court, and joined issue on the ninth.

The Court sustained the demurrer, and granted the plaintiff's application to strike out the 8th plea.   The defendant then filed a plea to the jurisdiction of the Court,

alleging in its plea that the action instituted was a criminal information, and should have been instituted in the Criminal Court of Baltimore city. To this plea the plaintiff also demurred, and the Court sustained the demurrer.

At the trial of the cause, upon the ninth plea of *not guilty*, the defendant took six exceptions to the ruling of the Court. The first, to the admissibility of the evidence of Michael Waterman. The second, to the proposal of the plaintiff to offer evidence to show a want of repair of the defendant's road, in parts thereof lying outside of the limits of the city of Baltimore. The third, to the admissibility of evidence of a want of repair of defendant's road, existing more than a year before the commencement of this suit. The fourth, to the refusal of the Court to allow the defendant to ask the witness, Rittenhouse, the questions stated in this exception. The fifth, to the refusal of the Court to allow the defendant to offer the evidence mentioned in this exception, to rebut the evidence offered by the plaintiff to maintain the issue on her part. And the sixth, to the plaintiff's prayer granted by the Court.

Upon the rendition of the verdict by the jury, the defendant moved in arrest of judgment; which motion the Court overruled, and entered judgment for the plaintiff, as stated in the record, including costs.

As to the plaintiff's demurrers, we deem it proper to say, that to the proposition of law stated by the appellant, that a general demurrer to a plea confesses all the facts in the plea, must be added the qualification that they be well pleaded. *7 H. & J.*, 372. *2 H. & G.*, 143. Upon a general demurrer, the Court will render judgment against the party which commits the first error in pleading. *1 H. & G.*, 471. *10 G. & J.*, 27. And as the demurrers, according to the well established rule, carry us up to the first fault, we must resort in this case to the *scire facias*, to see if there be a sufficient cause of action stated to entitle the

290        MARYLAND REPORTS.

The Pros., Man. & Co. of the Wash. & Balto. Turnpike Road, *vs.* The State.

appellee to recover. If so, our attention is next directed to the pleas, and we are to determine whether any or all of them are sufficient in law to entitle the appellant to judgment thereon.

In reference to the motion in arrest, we find that in the case of *Charlotte Hall School vs. Greenwell*, 4 *G. & J.*, 416, the Court said: "The motion in arrest of judgment serving, in some measure, the office of a demurrer, we must consider that the whole record was brought to the view of the Court. The motion in arrest of judgment must be governed by the principles of a demurrer."

The plaintiff, relying on its demurrers to the defendant's pleas, and the defendant on its pleas and motion in arrest, so far as the pleadings are concerned, has induced us to set out the above ingredients of a general demurrer and motion in arrest, that we may correctly dispose of this case, so far as it is affected by these proceedings.

Does the *scire facias* in this case, being in the nature of an original action, set out a substantial cause of action, and with such certainty that the defendant is fully informed of the grounds on which the plaintiff seeks to recover? Our opinion is, that it does. The *scire facias* sets forth the obligation of the defendant under the Act of incorporation, and expressly charges a violation of this obligation, and the mode and manner in which it was violated; and, in the language of the Act, seeks to ascertain whether the charter and corporate powers and franchises of the defendant ought not, by reason of *non-user and abuser* of said powers and franchises, to be declared vacated and annulled. The writ fully discloses the plaintiff's cause of complaint, and affords the defendant the opportunity of defense, of which it has availed itself fully in its several pleas.

We shall next consider whether the writ of *scire facias* was the appropriate remedy to obtain the object intended by the Act of 1860, ch. 326. Of this, we think there can

DECEMBER TERM, 1862.    291

The Pres., Man. & Co. of the Wash. & Balto. Turnpike Road, *vs.* The State.

be no doubt.    In the case of *The Canal Co. vs. The Rail Road Co.*, 4 *G. & J.*, 121, 122; in the case of the *Regents of the University vs. Williams*, 9 *G. & J.*, 425; and in *Angell & Ames on Corporations*, 743, 3rd *American Edition; scire facias* was held the appropriate remedy in a case like this.    But it was contended by the appellant, that as the Act of 1860 prescribed no form of proceeding, and the Act of 1832, ch. 306, which did prescribe the proceeding by *scire facias*, was repealed by the Code, the Superior Court, if it could entertain jurisdiction, was restricted to the ascertainment, "whether the charter and corporate powers and franchises of the President, Managers and Company *ought*, by reason of non-user or abuser of such powers and franchises, to be declared to be vacated and annulled," without power to enter judgment upon the ascertainment.

The answer to this is, not only that the appellant prays *judgment* in every plea, if sufficient to bar the plaintiff's action, but it could not be deprived of its charter, except upon full hearing and *judicial* judgment of forfeiture.    The theory of the appellant would render the Act of 1860 nugatory.    And if the Legislature passed a law predicated upon the ascertainment, declaring the charter of the appellant annulled and forfeited, it might be exercising judicial functions contrary to the Constitution and Bill of Rights, about which, however, we need express no opinion. The Act of 1832, though prescribing the mode of proceeding by *scire facias*, created no new remedy, but was merely declaratory of the law as it then was, and its repeal by the Code, took no jurisdiction from the Courts of Common Law, but left that jurisdiction undisturbed.

Testing the appellant's pleas by the rule, that the facts set out in them must be well pleaded, we do not find that those in the first and second pleas offer a legal defence to the allegations charged in the appellee's writ of *scire facias*, if those allegations are sustained by competent evi-

dence to justify the jury in finding for the plaintiff on the issue of not guilty. The State, through its legislative department, may have impaired the value of the franchise of the appellant by the Acts mentioned in those pleas, yet it was *damnum absque injuria.* It was a misfortune. See *Baltimore & Ohio R. R. Co. vs. Washington & Baltimore Turnpike Road,* 10 *G. & J.,* 392. *Charles River Bridge vs. Warren Bridge,* 11 *Peters,* 420. The Acts of the Legislature by no means released the appellant from the fulfilment of its obligation under its charter. It was still enjoying the privilege of charging tolls upon its road, and was bound to render a full equivalent to the community to justify the charge.

As to the allegation in the *scire facias,* that the appellant failed to keep the bridges over the streams crossing the turnpike road in good order and repair, it is no sufficient answer to say, that the 13th section of the Act of 1812, giving power to erect bridges, was permissive only, and not mandatory. If the bridges were an essential part of the road, and the road was impassable without them, it was a part of appellant's duty, having erected them, to keep them in repair. See 23 *Wendell's Rep.,* 259.

As to the third and fourth pleas, and the facts therein stated, it may be true that the Act referred to was passed, recognizing the corporate existence of the appellant, and admitting that the road was *then* maintained and kept in sufficiently good order and repair, and that during the whole of the year next preceding the commencement of this suit, it was kept in as good order and repair as it was when the Act of 1839 was passed; or, as in the fourth plea, that the State, by the Acts of the Legislature, and the conduct of its officers, admitted that until 1858, the turnpike road was kept in sufficiently good order, and while in that condition, was enabled to make the agreement stated in this plea, and in consequence of this agreement and sale

of stock, the road was put in better order during the year next preceding the commencement of this suit than it was at the time of the agreement to purchase. Yet it cannot be successfully contended that the State, though tacitly waiving, during the time above stated in these pleas, the enquiry into the condition of the road, deprived itself of the right to ascertain whether the appellant had been guilty of non-user or abuser of its franchises, and to direct that ascertainment to be made in view of the requirements of the Act of incorporation, which was the true and only standard of the appellant's responsibility.

Notwithstanding the Act of 1833, mentioned in the fifth plea, and the privilege to charge tolls on steam carriages, the resolution of the company to contract for the loan of money upon the security of the tolls, and though the appellant may have applied all the tolls (as stated in the seventh plea) to the repair of the road, yet the conclusion arrived at by this Court, in reference to the third and fourth pleas, is equally applicable to the fifth and seventh; and as to the sixth, our opinion of that may be found in our review of the rights of the appellant under the 31st section of the Act of 1812.

We are of opinion that the action of the Superior Court was right in striking out the eighth plea, if it was not filed within the time prescribed by the rule of Court, and we must presume that the Court acted in conformity with its own rule, in the absence of the rule from this record. See *Cherry vs. Baker*, 17 *Md. Rep.*, 75.

Whatever might be said of the conduct of the appellant, in delaying to file the tenth plea until the decision of the Court upon the demurrers and plea of limitations, we are at liberty to presume, that as the appellant joined issue on the demurrers, it took the chance of a judgment in its favor on some one or all of them, and we doubt not, if the Court had so decided, no exception would have been urged

294        MARYLAND REPORTS.

The Pres., Man. & Co. of the Wash. & Balto. Turnpike Road, *vs.* The State.

as to its jurisdiction.   But apart from this, in our opinion, the proceeding under the *scire facias*, in all its stages, in this case, is essentially a civil action, and within the cognizance of the Superior Court, that Court having civil common law jurisdiction, under the Constitution of the State.

We proceed to consider the appellant's several exceptions:

As to the first exception, the rule is, where evidence is offered to the Court, who are to determine whether the witness is interested, if it appear to the Court that he is not, though he thinks himself interested, he shall be sworn.   See 6 *H. & J.*, 172.   In view of this rule, we think that Wartman was a competent witness.

The proposal to offer evidence to the jury, as mentioned in the second exception, could not be objected to by the appellant on the ground stated in this exception; because the road was an unit, and the evidence should be co-extensive with the limits of it, as established by the Act granting the charter.

The third exception presents the question of limitation, and involves the construction of the 10th section of the 57th Article of the Code.

Conceding that a defence under that provision of the Code may be availed of under the general issue, without being specially pleaded, but without so deciding, still we are of opinion that the provision of the Code referred to, does not apply to a proceeding like this.   Although the result of a decision on the *scire facias*, against the defendant, will involve a forfeiture of its franchise, yet it cannot be said that this is a suit for a fine or forfeiture, within the meaning of this section of the Code.   A reference to the original Act of 1777, ch. 6, containing the same provisions as that found in the Code, will show the meaning of the

Code, and that the appellee was not confined to evidence of want of repair within the year.

The refusal of the Court to allow the appellant to ask the questions of the witness, Rittenhouse, stated in the fourth exception, was correct. The contemplated speculations of the witness, in the event of the condemnation of the road, were wholly irrelevant to the issue before the jury.

The appellee having offered evidence tending to show the wilful neglect of the appellant in keeping its road in repair, the appellant sought to rebut this evidence with the evidence stated in the fifth exception. Upon the objection of the appellee to this evidence, the Court sustained the objection, and we think correctly. All the facts relied on by the appellant, in this exception, might tend to prove an inability to keep the road in repair, and yet its responsibility was not removed by such inability. The objection made by the appellant to the charge of *wilful* neglect, in our opinion, is misconceived. The term does not, in this case, imply criminality, but must be construed to mean permissive, voluntary neglect.

We see no objection to the ruling of the Court in granting the appellee's prayer mentioned in the sixth exception. The prayer submits to the jury to find whether the appellant had failed and neglected to maintain and keep its road, or parts thereof, and the bridges over the streams crossing the road, also in good order and repair, and whether the same were maintained in the manner prescribed by the Act of 1812, ch. 326, and incorporates into the prayer the very requirements of the Act as the subject of enquiry for the jury. We therefore sustain the ruling of the Superior Court upon all the exceptions taken by the appellant.

Having approved of the action of the Court upon the demurrers, in which we regarded the applicability of the *scire facias* to this case, and also the sufficiency of the al-

legations set out in the writ, we deem it unnecessary to say anything in reference to the motion in arrest of judgment.

The judgment must be affirmed.

*Judgment affirmed.*

(Decided December 17th, 1862.)