G. E. HARRIS, Attorney General, etc., vs. MISSISSIPPI VALLEY & SHIP ISLAND RAILROAD CO.

1. QUO WARRANTO: *Railroad franchise.*

It is not every excess of power, nor every omission of duty that produces the effect of forfeiting a charter.   The public must have an interest in the act done, or omitted to be done.   If it is confined to the corporation, and in no wise affects the community, it should not be considered as of those conditions upon which the grant is made.   The injunction of the legislature to the courts is to construe the charter favorably and liber-ally for the corporation, so as to carry out its purposes.   In order to a forfeiture, there must be something wrong done, arising from willful abuse or improper neglect.

2. SAME: SAME: *Failure to comply with requirements in the charter.*

Where the charter of a railroad defines the beginning point and terminus of the road, gives the general direction, and requires a survey of the route to be made, and a map made and filed in the office of the secretary of state within twelve months from the granting of the charter; this is not a material condition in the charter, and a failure to comply with it will not work a forfeiture of the franchise.

3. SAME: SAME: *What will work a forfeiture of a franchise.*

Courts will proceed with extreme caution in proceedings which have for their object the forfeiture of corporate franchises, nor will it be visited except for a plain abuse of power, by which the corporation fails to ful-fill the design and purpose of its organization.   The acts of misuser, or nonuser must be touching matters which are of the essence of the con-tract between the sovereign and the corporation, and they must be will-ful and repeated.

4. SAME: SAME: *Failure to elect directors.*

A failure of the railroad company to elect directors does not work a disso-lution of the corporation, as the old board hold over until their succes-sors are elected and qualified, and though they may not have had any election since the date of the amended charter, it is not dissolved until it has lost its power to perpetuate itself.   So long as there remains the capacity of reviving restoration, it is not dead.

5. SAME: SAME: *Misapplication of money loaned by the state.*
The state made the loan to secure the speedy construction of the road in view of its importance to the state. The loan was authorized to be made to aid in the construction of the road, and if not so used, the information should have stated so, specifically, and have pointed out the misappropriation complained of.

ERROR to the Circuit Court of *Warren* County.

Hon. GEORGE F. BROWN, Judge.

This was a petition in the nature of a *quo warranto*, against the Mississippi Valley & Ship Island Railroad Company, on the following grounds, to wit:

1. A failure to prepare and file in the office of the secretary of state a map of its proposed line, as required by the charter of incorporation.

2. Commencing at Vicksburg and running south, contrary to the requirements of the charter.

3. A failure to organize the company under the amended charter.

4. For the misapplication and the misappropriation of the money loaned to said road by the state, to the amount of $110,000. A general demurrer was filed, and sustained by the court, and the case comes to this court on a writ of error.

*G. E. Harris*, Attorney General, *W. L. Nugent* and *Hiram Cas-idy*, for plaintiff in error:

*G. L. Potter* and *Johnston & Johnston*, for defendants in error:
[The reporters find no briefs on either side of this case.]

SIMRALL, J., delivered the opinion of the court.

An information, by *quo warranto*, was brought by the attorney general against the defendant, a railroad corporation, to obtain a judicial forfeiture, on assumption by the state of the franchises and corporate privileges granted to the defendant. Several grounds are stated:

First. That by the second amendatory act of the original charter, approved the 18th April, 1873, the defendant was required within twelve months thereafter, to cause to be prepared, and file

in the office of the secretary of state, a map of the proposed line of railroad, certified by the chief engineer, " which shall be taken as *prima facie* evidence of the location of its line," and thereupon said company was to be entitled to all rights and franchises upon said line, etc. " Yet the company have utterly failed and refused to comply with the requirements of said section, and have not prepared and filed the map."

The defendant's franchises are contained in its original charter, granted by the legislature, in the act of the 8th March, 1871, and the subsequent amendments thereto. The general purposes are declared in the second section, to build, equip and operate a railroad from a point at or near Vicksburg, through the state, in a southeasterly direction, in the direction of Pensacola, Florida, with a branch to Ship Island, or such other point on the gulf coast as may be preferred. The fourth section gives the use of the state lands for timber, gravel and other material, and also a width of 200 feet for a road bed.

The amendatory act of the 18th April, 1873 changed the corporate name of the defendant to that of the Mississippi Valley & Ship Island Railroad Company, and among other things, repealed so much of the original charter as located the road in the direction of Pensacola, and defines a new line, from a point at or near Ship Island, or such other point on the gulf coast as may be deemed most eligible, in a northerly or northwesterly direction to Vicksburg. Immediately follows in the same section, the matter upon which is founded the first specification in the information. The change made in the line of the road is in dispensing altogether with Pensacola as the suggested terminus of the main trunk, and that point as the direction from Vicksburg, and substituting as the terminal point on the gulf, Ship Island, or any other point on the coast line in this state, that may be thought more eligible. The original act takes Vicksburg as the starting point; in describing the general direction, the amended charter begins on the coast, and points out the bearing and direction towards Vicksburg as the western point of termination. We

can discover no importance or significance suggested by the change in the starting point, for purposes of description of the route adopted in the last act. That portion of the statute to which the first specification points is as follows:

"And said company is hereby required, within twelve months after the passage of this act, to cause to be prepared and file in the office of the secretary of state, a map of said proposed line, * * * and (it) shall be taken and held as *prima facie* evidence of the location and termini of said line; and said railroad company shall be entitled to all the rights and franchises upon said line, the same as if the location and termini of said line * * had been definitely and specifically set forth in the original act of incorporation of said company." 2d section, p. 562.

In the Commercial Bank of Natchez *v.* State, 6 S. & M., 617, a distinction is enforced (which is just and reasonable) between those provisions of the charter, which are intended to apply merely to the internal government of the corporation, and those which impose positive conditions, restrictions or duties, in which the public interest is involved. For a violation of the latter a forfeiture occurs, but not so with regard to the former." It is not every excess of power, nor every omission of duty, that produces that effect. The public must have an interest in the act done, or omitted to be done. If it is confined exclusively to the corporation, and in nowise affects the community, it should not be considered as of those conditions upon which the grant is made.

The injunction of the legislature to the courts is to construe the charter favorably and liberally for the corporation, so as to carry out its purposes. In order that the corporation may be visited with a forfeiture of its franchises, there must be something wrong done, arising from willful abuse or improper neglect. 4 Gill & Johns., 106, 107. The same idea is expressed in 23 Wend., in this wise: "There must be something more than mistake and accident." In State *v.* Real Estate Bank, 5 Ark, 601, in respect of misuser, it was said: "There must be such neglect or disregard of the trust, or such perversion to private purposes, as in some

manner to lessen its utility to those for whose interest it was granted, or else to work some public injury. "It must be in some sense or other a misdemeanor in violation of the trust."

Since the information must state a case, which, if admitted to be true or proved, will support a judgment of ouster and forfeiture, it was held in State *v.* C. & H. T. P. Co., 2 Sneed, 255, that the information was fatally defective, which did not allege the misfeasance, malfeasance or nonfeasance to have been willful. The same principle is contained in State *v.* M. Ins. & Trust Co., 8 Humph., 254.

This information does not aver that the defendant has done or omitted to do any of the acts set forth in the several specifications, willfully or negligently, and for that reason the circuit court might properly have sustained the demurrer. There ought to have been an allegation to the effect that the defendant was willfully in default; that failure to file the map, in contempt of its duty and obligation, must be the gravamen of the charge.

What was the motive of requiring this map? It is placed in the same section in the amended charter, and in immediate connection with that portion of it relating to the change of the line and the sea coast terminus. Vicksburg is fixed as one end of the line, the other terminus is Ship Island, or such other point on the gulf coast in this state as the corporation may select. Any point in a distance of one hundred miles or more, could be under the charter, designated as the terminal point. It might have been in either Hancock, Harrison or Jackson counties.

The line to be designated on the map is called the " proposed line." It shall be taken and held as "*prima facie* evidence " of the location and termini. Would the map line be irrevocably fixed upon the corporation? If, after surveys should prove another line to be cheaper and better, or as inviting more local aid in subscription, or as promising more business, would the company have a right to abandon the map line and adopt this more feasible one? The use of the words " proposed line " and "*prima facie,*" would seem to indicate that the company were not intended to be concluded by it.

If the proposed route might be changed, it is not perceived how any consequences detrimental to the public ensued from the failure to make and file the map.

The act of April 5, 1872, gave to the defendant the privilege of purchasing from the state all the public lands within ten miles of the main line, and authorized branches, at the nominal price of two cents per acre. The company had also the privilege of getting lumber, gravel, or other material from the state lands. Construing the charter by the liberal rule, which it enjoins, we may find in this statute the reason for the map.

If filed within the twelve months, it might have the effect of notice to the state authorities that the privilege of purchase attached according to that line, and thus the sales of public lands in that strip of twenty miles breadth would be withdrawn. Until the state was thus notified, the right to sell would be continued. In this view of it, the defendant was the only party interested in the map, the sole beneficiary.

When the charter speaks of franchises resting on this line, it refers to the privilege of the purchase of the lands, and the use of lumber, gravel, and other material from the public lands.

The legislature did not propose to confine the corporation to any particular line. The charter submits the selection to the corporation, with a very broad discretion. If it did not like Ship Island as a terminal point, it might adopt any other on the Mississippi sound which, within the privilege of the charter, might be fifty miles or more east or west of that point. The charter does not fix a time within which a definite survey and line shall be established. The corporation was not compelled to begin the work within one or two years — three is the limit. The state was indifferent to any particular line, so it maintained the general direction from the initial point adopted on the gulf coast towards Vicksburg.

If the corporation has not concluded to adhere to the "proposed line" that might be laid down on the map that might be filed, but might abandon it, in part or altogether, the filing of the map

could have no other effect than notice to the state that the company would insist on its privilege of land purchase within the prescribed area. If the map was not filed, the privilege did not attach, and the state could continue to sell.

2. The second specification is, in substance, that the defendant has, without color or authority of law, and contrary to its charter, located a pretended line of road from Vicksburg towards the town of Warrenton. The authorities teach the doctrine that courts proceed with extreme caution in proceedings which have for their object the forfeiture of corporate franchises, nor will it be visited except for a plain abuse of power, by which the corporation fails to fulfill the design and purpose of its organization. High on Ex. Rem., § 649; State v. Commercial Bank, 10 Ohio, 535. The acts of misuser or nonuser must be touching matters which are of the essence of the contract between the sovereign and the corporation, and they must be willful and repeated. High, § 648; Commonwealth v. Commercial Bank, 28 Penn. St., 383. In order that the courts shall proceed with requisite caution and circumspection, it is required that the information shall state with precision every fact which constitutes the abuse of the franchises complained of.

This allegation is vague, indefinite, if not evasive. It is difficult to see upon what predicate of law it rests. Does it mean to affirm that the surveys and location of the line must begin on the gulf and be prosecuted from that point towards Vicksburg, and that the defendant has broken his charter by starting at the wrong end of the line? If that is the idea, it arises out of a misconception of the charter. If the intent be to aver the location of the line, materially variant from the discretion of the charter, the allegation is quite uncertain and defective. It is not alleged that the entire route has been surveyed and located definitely, which deviates from that laid down in the charter; nor is it shown how much of the line has been located in a southern direction towards Warrenton; nor that it was done willfully to evade the charter. If deviation from the charter line be complained of, it must be pointed out in the information that it is a material departure, and

how, so that the court may be able, on the facts stated, to pronounce, as a matter of law, that the charter has been violated and the penalty incurred.

It is not every deflection from the line laid down in the charter that is condemned. The departure must be so important as to show that the line established is different from the line authorized. The legislature, in general terms, gives the course from the initial point on the Gulf to Vicksburg. That does not mean in a straight or air line. The defendant is left to its judgment. The matters to be considered are the hills, valleys, water courses and general topography of the country. These must be subject to the examination of scientific skill and instruments. Natural obstructions may be evaded by going around them. To avoid such obstructions, a sharp departure for a short distance from the general course is necessary and proper, and plainly not a deviation. In such a case, the motive was not to evade the charter, but to do what is allowed this defendant, and generally all such corporations, viz: To make choice of what it considers the best and most practicable lines between terminal points, observing the general course indicated in the charter.

3. The third specification is to the effect that the defendant failed to elect a board of directors, as provided by the charter and by-laws, and that there is not now a lawfully constituted board.

The fifth section of the original charter provides that vacancies in the directory shall be filled by a vote of two-thirds of the directors remaining. If the election is not had on the day appointed, " the said company shall not, for that cause be dissolved," but the election may be holden on any subsequent day which the then existing directors may appoint. Directors continue in office until their successors are elected and qualified. It may be true, therefore, as stated in the information, that the corporation has not elected directors since the passage of the amended charter of 1873, yet there may be directors, chosen before that time, competent to do business, and who would hold over until their successors were elected.

This allegation assumes that by reason of the nonelection of the board of directors (within the time stated), the corporation has been dissolved.   The legislature, in the particulars of the charter referred to, has very carefully guarded against that consequence. The rule is that a corporation is dissolved when it has lost the power of perpetuating itself; when (according to its nature), from the loss of its chief officer, or an integral part, and in its imperfect state, it has not the capacity to recuscitate or restore itself by a new election.   So long as there remains the capacity of reviving restoration, it is not dead.   Ang. & Ames, Corp., §§ 768, 769.   No loss of members destroys a corporation so long as a sufficient number remain to continue the succession and fill up vacancies.   Nor does the mere failure of the trustees or directors to meet dissolve the body.   State *v.* Trustees Vincennes University, 5 Ind., 80, 81.   That case, both in the questions of law and fact, is very similar to this.   The point ruled was, if enough trustees remained to fill up vacancies, and restore the corporation to vitality, although the board may not have kept up its regular meetings, the corporation was not dissolved, and that it was incumbent on the state to show the condition of facts which produce a dissolution.

Assuming everything to be true that is alleged in the information, it is clear that this corporation has not been dissolved.

4. The fourth and last specification is, in effect, "that the defendant has misappropriated and misapplied the money received from the state," etc.

This refers to the fund loaned by the state, as set forth in the third section of the amended charter.   The section is preceded by a preamble which recites that the legislature recognizes the importance to the state of said railroad, and desires to extend to said company such material aid as will secure the early construction thereof.   The enactment, giving effect to this motive, makes the loan "to be used in aid of the construction of the defendant's railroad," the fund to be paid over on the conditions and in the sums named in the fourth section.   See acts, pp. 563–4.

This allegation is especially obnoxious to the criticism which

has been applied to the others. It is a general statement; more of opinion than of fact. The facts are kept back. Whether they would in law amount to misapplication or not can not be known until they are disclosed. The loan was authorized to be made to aid in the construction of the road. If not so used the information should have stated so specifically, and pointed out the misappropriation.

It may be proper to observe that this and the two preceding specifications were not as much relied upon at the argument and briefs as the first one.

We are of opinion that there is no error in the judgment. It is affirmed.

TARBELL, J., dissenting.

*Quo warranto* praying judgment of forfeiture of charter, for the following causes :

1. Neglecting to prepare and file in the office of the secretary of state a map of the proposed line of railway, as required by the charter.

2. Locating a portion of said road, beginning in Vicksburg, running thence in a southerly direction, contrary to requirements of the charter.

3. Failure to organize the company by the election of a board of directors, whereby the company is without a lawfully constituted board of directors.

4. The misapplication and misappropriation of money loaned by the state in aid of the construction of the road to the amount $110,000 for elven miles of pretended road.

A general demurrer to the petition was sustained and the petition dismissed. Hence a writ of error on the part of the state.

This mere intimation of the allegations of the complaint indicates the necessity and duty of investigating the management and transactions of this company, if nothing more. It excites surprise, that charges of the character alluded to should be dismissed without answer, explanation, or denial even, but upon a confession of their truth.

If to some of the allegations of the information there had been an answer, and a demurrer to others, this case would be in a condition much more satisfactory to my mind, but it must be disposed of upon the record made by the parties.

In an examination of the record, the attention is attracted to the vast number and magnitude of the rights, privileges, and franchises granted to defendant, as claimed by counsel in argument. If these claims shall be sustained by the courts, what is now a company, struggling for mere existence, may grow into a gigantic corporation, which, with other like institutions, may dictate the legislation of the state. Then, this little embryo railroad, of a few miles, may become a vast anaconda, binding the entire state in its iron grasp. Its pretensions, therefore, as protrayed by counsel, become material, in this, that in the interest of the people, the manner in which a company of such colossal proportions meets the obligations of its charter, demand closest scrutiny. The analysis of the charter of the defendant, and the rights, privileges and franchises, granted thereby, which follow, are as presented by counsel:

" The original charter of defendant was granted in 1871, the purpose of which was declared to be the construction of a railroad from or near the city of Vicksburg * * on a southeasterly line through the state of Mississippi, in the direction of Pensacola, Florida, with a branch to Ship Island or to * * such point on the coast of Mississippi, as may be deemed most eligible." Acts 1871, p. 238, sec. 2.

" By the same act, a privilege was granted to the company, viz : to 'run an additional branch from some suitable point of said road in a westerly direction through Claiborne county, Mississippi, to Grand Gulf, near the Mississippi river.'" Act 1871, p. 238, sec. 1.

" In 1872, an act was passed to facilitate the construction of the road and for other purposes, by which the company was privileged to purchase from the state at the price of two cents per acre 'all lands' held by the state by forfeiture or purchase for

taxes, and 'other lands belonging to the state, lying within ten miles of the main line or authorized branches' of its road.

"It was also empowered to construct a branch road to Jackson and to build such other branches and extensions as the directory may deem necessary and expedient." Acts of 1872, p. 281–2, secs. 1, 2.

"In 1873, the name of the company was changed, and it was enacted 'that so much of said act of incorporation as can be construed as locating the main line of said railroad from Vicksburg, in the direction of Pensacola, Florida, be and the same is hereby repealed, and the main line of said railroad is declared to be that extending from a point on the coast of the Gulf of Mexico, at or near Ship Island, or such other point of the gulf coast of Mississippi as may be deemed most eligible, in a [northerly or northwesterly direction, to the city of Vicksburg.'" Acts 1873, p. 562, sec. 2.

"By the same act, it was declared that the defendant should be 'entitled to the full exercise and enjoyment of all the rights, privileges, powers and immunities which are by the law granted to any railroad company in this state,' excepting the privilege granted to the M. & N. W. R. R. Co., by the act to facilitate its construction." Acts 1871, approved May 8, 1871. Acts 1873, p. 562, sec. 1.

"Here was a grant to defendant of a privilege to exercise and enjoy 'all the rights, privileges, powers and immunities, granted to any other road by the state, excepting only the privilege granted to the M. & N. W. road to purchase all state lands lying within 'ten miles' of its road."

"Under this last provision, the defendant became entitled to the 'privilege' granted to the Corinth and Nashville road to purchase at two cents per acre, on certain conditions 'all lands' forfeited or purchased by the state for taxes, lying within ten miles of its line of road." Acts 1872, p. 283–4, sec. 2.

"There was another privilege granted to defendant, and important to be noticed, viz: The original charter gave the defend-

ant the privilege of a free right of way 200 feet wide, ' through and upon any lands of the state, and also the free use of state lands for depots, stations, cuttings, turnouts,' " etc.   Acts 1871, p. 240, sec. 2.   And by the same act it has the usual power to force a right of way.   Acts 1871, pp. 240, 242–3.

"It is entitled to the right of 'perpetual succession.' "   Acts 1873, p. 562, sec. 1 ; acts 1871, p. 137, sec. 23.

"It is also entitled to the privilege granted to the N. & J. R. R. Co., viz :   ' In case it shall so happen that an election of directors shall not be made   *   *   said company shall not, for that cause, be deemed to be dissolved, but such election may be holden on any day   *   *   and directors and officers shall continue in office until their successors are elected and duly qualified.' " Acts 1870, p. 226, sec. 8 ; acts 1871, p. 242, sec. 5.

"It is entitled to the general privilege granted to the N. O., J. & G. N. R. R. Co., viz. : Power to build and construct one or more branch railroads."   Acts, 1871, p. 178, § 10.

" Defendant is authorized to receive absolute donations of real estate without limit as to value.

" It might receive subscriptions from counties, cities and towns.

" It might obtain rights, privileges or franchises from incorporated cities or villages.

" It might, also, purchase or lease railroads, their charters, franchises and property, and maintain and use the same ; and it might, by mutual contract, consolidate with other roads."

It is further claimed, that the defendant has three years from April 18, 1873, within which to commence the building of the road ; and that the charter " shall be favorably and liberally construed so as to favor all the purposes and the objects of the same, and the operation of the provisions thereof."   Acts, 1871, pp. 251, 252, § 23.

This last claim may be first considered.   A liberal construction of the statutes involved was, assuredly, never enjoined for the purpose of excusing the company from the requirements of its charter.   Acting up to its spirit and interest, those acts would

then command a liberal construction. The express direction is to construe these acts favorably and liberally for "the purposes and objects of the same." These "purposes" and "objects" are, therefore, to be sought out and declared. Upon the face of these acts, the "purposes" and "objects" of this legislation were to secure railroad connection with the gulf at Ship Island, and for a harbor within our own state. Cotemporaneous legislation and public history evidence the same purpose and object. Indeed, it is well known to all, to have been a favorite "purpose" and "object" to secure a harbor on the gulf with railroad connections elsewhere. The facts are too apparent and too familiar to require demonstration.

Reference will be made to the acts involved and to other contemporaneous legislation, not as evidence of the purposes and objects just mentioned, but in aid of the construction of the acts in question and of the allegations of the complaint in this case. The original charter of defendant was granted in 1871, and authorized the construction of a railroad "from or near the city of Vicksburg * * on a southeasterly line through the state of Mississippi, in the direction of Pensacola, Florida, with a branch to Ship Island." Subsequently, as is well known, public sentiment was concentrated on a harbor within our own limits, and hence, in 1873, the legislature amended the charter of defendant in the following particulars:

1. The name of the company under the original charter was the "Vicksburg, Pensacola & Ship Island Railroad Company." This was changed to the Mississippi Valley & Ship Island Railroad.

2. Under the original charter the company was authorized to construct a road "from or near Vicksburg, in the direction of Pensacola, Florida, with a branch to Ship Island." Section two of the amended charter uses the following positive and emphatic language: "That so much of said (original) act of incorporation as can be construed as locating the main line of said railroad from Vicksburg, in the direction of Pensacola, Florida, be and the same is hereby repealed, and the main line of

said railroad is declared to be, that extending from a point on the coast of the Gulf of Mexico, at or near Ship Island, or such other point on the gulf coast of Mississippi as may [be deemed most eligible, in a notherly or northwesterly direction to the city of Vicksburg."

3. This last amended route is expressly recognized in the amended act as one of importance to the state.

4. Section two of the amended charter contains the following provision, not required by the original charter : " And said company is hereby required, within twelve months after the passage this act, to cause to be prepared and filed in the office of the secretary of state, at Jacksom, Mississippi, a map of said proposed line of railroad, which shall be certified by the chief engineer of said company, and shall be held and taken as *prima facie* evidence of the location of said line."

The " purpose" and "object" of the change in the name of this company, in the change of the route or line " from or near Vicksburg," and thence southerly, to the route or line " from a. point on the coast of the Gulf of Mexico, at or near Ship Island," thence " in a northerly or northwesterly direction, to the city of Vicksburg," and in the command to file the map of the line, will be more manifest when the facts following are considered :

1. Numerous other railroad routes were being chartered.

2. At the same session of the legislature, when the amended charter in question was passed, a charter was granted to the Pascagoula & Jackson Railroad Company, with power to construct a railroad from Pascagoula to Jackson, Mississippi, with the privilege of connecting with any other railroad, and with authority to extend said road into the bay of Pascagoula. Acts, 1873, p. 496.

3. At the same session another act was passed incorporating the Mississippi City & Helena Railroad Company, empowering said company to construct a railroad from some point at or near Mississippi City to some point on the Mississippi river, opposite Helena, Arkansas, with the duty of transporting the cars of any other road with which it connects. Acts, 1873, p. 531.

4. In the further prosecution of the " purposes " and " objects " indicated, the legislature, at its session in 1873, memorialized congress to grant to the Mississippi City & Helena Railroad Company the lands previously granted to the Gulf & Ship Island Railroad Company in 1856, which grant had lapsed. In that memorial the legislature said: " Believing that the construction of a road from Mississippi City to Helena, Arkansas, via Jackson, Mississippi, would lead to the development of the harbor of Ship Island, which is one of the best on the sea coast south of Norfolk, Virginia.   *   *   With the road constructed and in operation, this country (southern Mississippi), now so isolated, would fill up with a large population ; its unsurpassed wealth of timber would become available to the ever increasing demand for lumber; and the agricultural products would find an easy transit to the commercial marts of the world."

5. By the fifth section of the amended charter of defendant, it is enacted, " That 100 miles of said Mississippi, Vicksburg & Ship Island Railroad, next to Ship Island, is hereby declared to be a trunk road, which shall be free to all railroad companies, the southern terminus of whose road shall be Ship Island harbor, and which shall intersect said railroad within said distance of 100 miles from Ship Island; and said company or companies, whose railroad shall intersect said trunk road, as aforesaid, shall have the privilege of running their trains upon said trunk road to and from Ship Island free of charge."

6. Section 1 of an act approved April 5, 1872 (acts of 1872, p. 281), enacts " that all lands forfeited to or purchased by the state of Mississippi for taxes due and unpaid thereon, or other lands belonging to the state, and lying within ten miles of the main line or authorized branches of the Vicksburg, Pensacola and Ship Island Railroad, shall be sold to said railroad company at the sum of two cents per acre, and the auditor of public accounts is hereby authorized and required to sell and convey said land to said Vicksburg, Pensacola and Ship Island Railroad Co., upon payment of said sum of two cents per acre."

7. Section 2 of the amended charter of defendant concludes thus : " And said railroad company shall be entitled to all the rights and franchises upon said line (the line to be designated by the map), the same as if the location and termini of said line of railroad had been definitely and specifically set forth in the original act of incorporation of said company."

The materiality of the map is thus shown :

1. By the quotation last made the map is to take the place of, and answer as a substitute for the omission to define and specify the route in the act of incorporation.

2. By section 2 of the amended charter of defendant, all the rights, privileges and franchises granted are, by the very language and terms thereof, made dependent upon the survey and map.

3. The map was necessary to enable the auditor to carry out the authority to sell and convey the lands of the state to the company.

4. It was necessary to the rights of other railroad companies.

5. It was necessary to the connecting routes terminating on the coast.

Under all these circumstances; in view of all this legislation, and of the evident " purposes " and " objects " indicated, the map cannot be argued, reasoned, or ridiculed into insignificance. It was clearly material, important and vital, for it was a substitute for the want of specification in the act of incorporation, and the basis of all the rights referred to and involved.

But more than this, the charter declares that the map when filed " shall be held and taken as *prima facie* evidence of the location of said line." In other words, and conclusively, without such survey and map, there was no, not even a *prima facie*, location of the road. The result is fatal.

The second cause alleged against the defendant is in these words : " That the said Mississippi, Vicksburg and Ship Island Railroad Co., without color or authority of law, and contrary to and in violation of the provisions of said amendatory act, have located a pretended line of road from Vicksburg in a southerly

direction towards the town of Warrenton, and now claim and exercise the rights and privilege of appropriating to their use the lands of citizens of said state resident in the said county of Warren, and are taking and have taken the same."

Two grounds are suggested in the argument in answer to this allegation.   1. That the track towards Warrenton is a necessity of the topography of the country in the vicinity of Vicksburg. In other words, that this southerly direction is sought as an outlet only, and counsel suggests the "Walnut Hills" as rendering a direct course by the compass towards Ship Island impossible. 2. That the track towards Warrenton is within the authority to construct branch roads.

As to the first ground, the courts cannot judge of the feasibility of a direct route out of Vicksburg.   The facts must be ascertained by a survey and presented in evidence before the courts can decide upon this point.   With reference to the other ground suggested, it may be said: 1. It is clear from the amended charter that the main line should be first built; 2. that the construction of the main line should begin on the Gulf; 3. A branch road previous to the main line is unauthorized, and a plain, palpable violation of the purpose and object of the charter; 4. The track to Warrenton is not the trunk road within either the letter or spirit of the charter of defendant.   Upon the record it is more than absurd to claim this track as a part of the main line under the charter.

The third cause alleged against the defendant is this: " That under the fourth section of said original act of incorporation, the business and business affairs of the said Mississippi, Vicksburg, and Ship Island Railroad Company are by law required to be conducted and managed by a board of directors, the incorporators named in said act to be directors for the first year of the passage of said act, and until others were appointed or elected to fill their places, and after the expiration of the first year, the said directors were required to be elected annually, at such time and place as might be designated in the by-laws of said company.   Notwith-

620     HARRIS, Att'y G'l, vs. M. V. & S. I. R. R. Co.     [Sup. Ct.

Dissenting opinion.

standing which provision, and that other directors than said incorporators were elected and entered upon the discharge of their duties, the said company has not since the approval of said amendatory act elected according to their charter and by-laws a board of directors, nor has said company now a board of directors lawfully constituted to manage their business, and business affairs."

The directors of the Vicksburg, Pensacola, and Ship Island Railroad Co. are not directors of the Mississippi, Vicksburg and Ship Island Railroad Co., but the directors of the latter are to be the lawful successors of the former. Acts, 1873, p. 567, § 8. It does not appear that the company under the amended charter has had any meeting, or has elected any directors, or has accepted the amendatory act of 1873. The charge is that the company has not elected directors under the amended charter, and has not a board of lawfully constituted directors. If directors have not been elected under the act of 1873, the company has not a board of lawfully constituted directors.

The fourth charge is this: " That under the third section of said amendatory act, the loan before then made to the several railroad companies in said state, under and by virtue of an act entitled 'An act to provide for the payment of interest on the Chickasaw school fund,' and for other purposes, approved March 7, 1856, and an act supplemental thereto, was set apart in the hands of the treasurer of said state as a special fund to be used in aid of the construction of said railroad, and for no other purposes; that under said section and section 3 of said amendatory act, the said company obtained from said treasurer one hundred and ten thousand dollars; and that they have misapplied and misappropriated the same contrary to law and said act."

This money was loaned in aid of the construction of the trunk road from Ship Island, not in aid of a branch road, which is the most that can be or is claimed for the track from Vicksburg to Warrenton. The money so used was misapplied and misappropriated. However expended, otherwise than in the construction

of the main line of road from the coast, the money was wrongfully diverted from the purpose and object of the loan.   Act 1873, sec. 3.   Here is a very large sum of money, which should be sacredly preserved and as sacredly devoted to the cause of education.   In its care, the tax payers and the 350,000 educable children of the state are deeply concerned.   The demurrer admits the misapplication and misappropriation of this money as charged.   The charge is made by the law officer of the state, and it is now become of record in the courts.   If the representatives of the company are unwilling to explain, and the courts shield them from investigation and from accountability, let all ears be deaf and all lips sealed forever as to the charges and their infinite changes, which have been rung throughout the state, involving the integrity of officials.   Plundering officials and kindred phrases have become as familiar as "household words."   Let them never more be heard, if $110,000 of a sacred fund can be misapplied and misappropriated by a corporation owing its existence to the legislature, with impunity.   For this sum, if the law was complied with, the state holds first mortgage bonds on eleven miles of track, whose value is not given in the record.   But more than this, the construction of the track from Vicksburg, down the bank of the Mississippi, is neither within the letter or spirit, or purpose or object of the charter of defendant.   To my mind, this track is in clear, palpable disregard of statutes, whose language and intent are so manifest as to be commands, and so plain that "he may run that readeth."

The legal status of the defendant is this:

1. Noncompliance with conditions precedent prescribed in sec. 2 of the act of April 18, 1873, so that the rights, privileges and franchises thereinafter contained never vested in the company.

2. The track down the bank of the Mississippi from Vicksburg towards Warrenton is not a compliance with the letter, spirit or substance of the charter of defendant.   It is not necessary to charge this deviation to have been "willful," or with a "bad motive."   On its face it was made knowingly, deliberately, inten-

622     HARRIS, Att'y G'l, vs. M. V. & S. I. R. R. Co.   [Sup. Ct.

Dissenting opinion.

tionally, and with a view to test the right to do so in the courts. The facts show it " wrongfully " done, which is, in legal effect, " willful."

3. Neglect to organize under the law of 1873, or to accept the provisions of that act. Sec. 8.

4. Misapplication or misappropriation of the fund loaned to the company by the state.

If it were conceded that the map is immaterial, and its requirement directory only, yet the utter neglect to inaugurate work on the main line within the time limited by statute would entitle the state to judgment. The track from Vicksburg in the direction of Warrenton is hardly a reasonable pretense of compliance with the statute. Add to this the misapplication and misappropriation of the money of the state, admitted by the demurrer, and the result is overwhelmingly conclusive. If this money was used only in the construction of a track from Vicksburg to Warrenton, it was still misapplied and misappropriated, for reasons heretofore shown. The loan was to "aid in the construction " of the main line, " and for no other purpose whatsoever." As the matter presents itself to my mind, the track referred to is not in law, in fact, or intent, any part of the railroad provided for by the charter under consideration, but at most only a branch road to some point short of the coast, while the state is as far as at the first from the long coveted harbor within her own boundaries.

The law of this case is simple. It may be tested by the rule quoted by counsel for the defendant, from Com'l Bank of Natchez v. State, 6 S. & M., 617 : "In the construction of charters a distinction must be observed between those provisions which are intended to apply to the mere internal government of the corporation and those which impose position, conditions, restrictions or duties, in which the public interest is involved. For a violation of the latter a forfeiture occurs, but not so with regard to the former." The several " positive conditions, restrictions or duties in which the public interest is involved," imposed by the charter of defendant, have been pointed out and need not be repeated here. Grant

on Corporations, 295–6 side p., gives a brief but clear exposition of the law governing such cases : " The general principle on which forfeiture of the charter rests is this, that a corporation cannot be allowed to take a grant and repudiate the conditions on which it is made, and, therefore, a breach of the conditions is punished by withdrawing the grant. But it is said, when there is a body corporate *de facto*, taking upon themselves to act as a body corporate, but from some defect that has grown up in their constitution, not being able to exercise legally the powers they affect to use, then the proper mode of depriving such body of the pretended powers which they assume is, by an information in the nature of a *quo warranto*, calling upon them to prove themselves legally entitled to act as they do, in a corporate character ; the effect of which is, upon its appearing that their right is defective, to strip them altogether of the power of acting and of being a corporation." And see the cases cited in the notes.   The conditions of the grant in the case at bar have been specified.   The map is one.   The loan of the money of the state to aid in the construction of the main line of a road connecting the harbor at Ship Island with the interior, is another.   And see others herein.

Great stress is laid upon the absence of the term "willful" from the complaint.   The authorities cited do not sustain the view sought to be impressed.   All these cases explain what is meant by the term.   Thus, in State *v.* M. In. & T. Co., 8 Humph., 254, it is said to be "improper neglect; something more than accidental negligence, excess of power, or mistake in the mode of exercising an acknowledged power."

The adjudication in The P. M. & Co. of The W. & B. T. R. *v.* The State, 19 Md., 239, was based upon a statute which in words made a forfeiture to depend on "willful" neglect.   The court say :   " The term does not, in this case, imply criminality, but must be construed to mean permissive, voluntary neglect." The term "willful misuser and nonuser," in Mumma *v.* The Potomac Co., 8 Peters, 281, means simply " permissive, voluntary neglect."

Mr. Justice COWEN, in The People *v.* K. & M. T. R. Co., 23 Wend., 193, uses "negligent," "contrary to duty," "wrongful," "knowingly," "breach of trust," etc., as the synonym of "willful," and in The People *v.* B. &. R. T. Co., id., 223, he explains "willful abuse" as "improper neglect, something more than accidental negligence, excess of power, or mistake."

It does not appear upon what ground the decision was based in The State *v.* C. & H. T. P. Co., 2 Sneed, 255. There is probably a statute on the subject in Tennessee. Whether there is or not, the case is too brief to be entitled to any consideration. The several cases to be found in 23 Wend., 193, 222 and 254, are completely exhaustive of the law by which the case at bar must be determined. As to the information, it is sufficient. A nonperformance of the conditions of an act of incorporation is *per se* a misuser that will forfeit the grant. It is not necessary, to work a forfeiture, that the neglect or refusal to perform the duties enjoined should proceed from a bad or corrupt motive; it is enough that the duties be neglected, or designedly omitted. And, there is no materiality in the distinction between conditions precedent and subsequent; or, that would exact the performance of the one as a condition of corporate being, and not of the other. Nor has the court any discretion to entertain the hardship of particular cases. Relief in such cases is with the legislature. The utmost limit of judicial discretion is exercised in deciding whether there has been a substantial performance according to the intent of the charter. This cannot be pretended even, in the case at bar. *Vide* cases in 23 Wend., *supra.*

And now, while I am cordially in favor of public improvements, and of state aid, under suitable circumstances, restrictions and guaranties, and while my sympathies are with the present managers of the road involved, as honorable gentlemen, nevertheless, my position requires me to hold the scales of justice evenly between these corporations and the people, whose rights must be guarded against charters under which mammoth companies may grow up to defy legislatures, courts and people. This investiga-

tion has been inspired by the feeling that all officials, and all persons and corporations holding relations of public trust, and charters granted in the public confidence, particularly when they are entrusted with money belonging to the state, either as a loan or as bailee, should be held to a strict, rigid, stern, unrelenting accountability.

Entirely satisfied as to the proper construction of the statutes involved, I have no hesitation in the conclusion that the judgment should be reversed, and judgment here for the state, or under the Code, §§ 577, 618, that the judgment be reversed and the cause remanded, with leave to amend.